PRESENT: Hassell, C.J., Koontz, Kinser, Lemons, Goodwyn, and Millette, JJ., and Carrico, S.J.

ALFREDO ROLANDO PRIETO

OPINION BY
v.  Record Nos. 082464      JUSTICE LEROY F. MILLETTE, JR.
       & 082465            September 18, 2009

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Randy I. Bellows, Judge

In this appeal, we review two capital murder convictions and two death sentences imposed by a jury upon Alfredo Rolando Prieto, along with his convictions for rape and grand larceny and two counts of the felonious use of a firearm while committing murder.  Prieto's first trial in 2007 (Prieto I) ended in a mistrial due to juror misconduct.  The 2008 retrial (Prieto II) resulted in the jury finding Prieto guilty of all charges and sentencing him to death on the two capital murders.  We affirm all of the convictions.  However, because the verdict forms utilized by the jury in imposing death sentences on the capital murders were defective, we reverse the two sentences of death and remand the case for resentencing.

We address the circuit court's denial of Prieto's motion for mistrial in Prieto I on the grounds that the jury was unable to reach a verdict during the sentencing phase of the trial, and refusal to direct a verdict of life imprisonment.

We also address the circuit court's granting of a mistrial for manifest necessity due to juror misconduct.

We address all of the convictions and sentences which were imposed following Prieto's retrial in Prieto II. We address the denial of Prieto's objection to the retrial, the denial of a separate proceeding regarding mental retardation, evidence lost during the almost 17 year gap between the murders and the identification of Prieto as a suspect, and the sufficiency of the evidence to prove Prieto was the immediate perpetrator and thus eligible for the death penalty. We additionally address issues that have been previously decided or waived. Finally, we consider Prieto's objections to the sentencing verdict forms and issues that may resurface in the remanded resentencing proceeding.

## I. PROCEEDINGS

Prieto was indicted for capital murder based on the willful, deliberate, and premeditated killing of Rachael A. Raver in the commission of or subsequent to rape. Prieto also was indicted for capital murder based on the willful, deliberate, and premeditated killing of Raver and Warren H. Fulton III, as part of the same act or transaction. In addition, Prieto was indicted for the rape of Raver, the felonious use of a firearm while committing the murder of

2

Raver, the felonious use of a firearm while committing the murder of Fulton, and grand larceny of Raver's automobile.

## A. First Trial (Prieto I)

In 2007, a jury in the Fairfax County Circuit Court found Prieto guilty of the capital murder of Raver, the capital murder of Fulton, rape, two counts of use of a firearm in the commission of murder, and grand larceny, as charged in the indictments. The circuit court ordered that the jury would make a determination of Prieto's alleged mental retardation prior to receiving evidence on sentencing. The court, in essence, trifurcated the trial into three phases: guilt or innocence, mental retardation, and sentencing. The court recognized that by separating mental retardation from sentencing, some of the evidence might be duplicative. However, in the mental retardation phase, the court intended to limit evidence relating to "victim impact" and "future dangerousness." Although evidence relating to victim impact and future dangerousness would ordinarily be presented in the sentencing phase, the court's purpose in trifurcating the trial was to focus on the issue of mental retardation. The jury would only address evidence relevant to the death penalty if it determined Prieto was not mentally retarded.

At the conclusion of the presentation of evidence on mental retardation, the jury was instructed that Prieto had

3

the burden of proving by a preponderance of the evidence that he was mentally retarded.  The jury was further instructed that if it returned a verdict finding Prieto mentally retarded, the jury should not fix punishment pending further evidence, but that Prieto's punishment would be limited to imprisonment for life without parole and a fine of up to $100,000.

After the jury began its deliberation on the issue of mental retardation, the court received two notes from the jury: one from the jury foreman indicating the jury's inability to come to a unanimous decision; and another from an individual juror (Juror D) stating that he was being pressured and asking to end the deliberation.  Over Prieto's objection, the court gave the jury a modified "Allen charge."[1]  Following a lunch break and the court's receipt of a second note from Juror D along with his refusal to continue deliberations, the circuit court declared a mistrial on the grounds of manifest necessity based upon Juror D's misconduct.

The court denied Prieto's motion to declare a hung jury and sentence him to life in prison without the possibility of parole.  The court ruled that it had no alternative but to

---

[1] Allen v. United States, 164 U.S. 492 (1896).

declare a mistrial for manifest necessity and order a retrial of the entire case.

## B. Second Trial (Prieto II)

In 2008, in the guilt or innocence phase of Prieto II, a jury found Prieto guilty of two counts of capital murder, two counts of use of a firearm in the commission of murder, rape, and grand larceny. In the sentencing phase of the trial, the jury found as to the two counts of capital murder that Prieto had not proven by a preponderance of the evidence that he was mentally retarded. In addition, the verdict form endorsed by the jury was based upon a finding of the "future dangerousness" or "vileness" aggravating factor without differentiating which factor or both factors; and the jury unanimously fixed Prieto's sentence at death for each of the two capital murder charges, and life plus twenty-six years for the other charges. The circuit court sentenced Prieto in accordance with the jury's verdicts and entered final judgment.

We consolidated the automatic review of Prieto's death sentence with his appeal of the capital murder convictions. Code § 17.1-313(F). We also certified Prieto's appeal of his non-capital convictions from the Court of Appeals and consolidated that appeal with his capital murder appeal. Code § 17.1-409.

II.  EVIDENCE AT TRIAL

We consider the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below.  Porter v. Commonwealth, 276 Va. 203, 215-16, 661 S.E.2d 415, 419 (2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1999 (2009); Gray v. Commonwealth, 274 Va. 290, 295, 645 S.E.2d 448, 452 (2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1111 (2008).

We initially provide a summary of the evidence at trial in order to establish an outline of the trial evidence. Additional details will be provided where relevant to specific issues of the appeal.

A. Guilt Phase Evidence

The last time Raver and Fulton were seen alive was after midnight on December 4, 1988 as they were leaving a Washington, D.C. restaurant with the intention of returning to Virginia in Raver's four door Toyota Corolla.  On the morning of December 6, 1988, Raver's partially nude body was found lying in a field located at the 1800 block of Hunter Mill Road, which lies just south of the Dulles Toll Road in Fairfax County.  Fulton's fully clothed body was found about 100 feet away from Raver's body.  Raver's jeans, underpants, gloves, and shoes were found approximately halfway between the two

bodies. Raver's car was not found at the scene of the murder nor at either Raver's or Fulton's residence.

Raver was killed by a single gunshot that entered her lower left back, traveled in a downward trajectory, and remained in her body. Dr. Frances P. Field, Assistant Chief Medical Examiner for the Northern Virginia District Medical Examiner's Office, who testified as to the cause of death of both Raver and Fulton, determined that Raver's wound would have been painful and death would not have been instantaneous. Raver also had scraping of the skin on her abdomen, legs, hands, and face, and a bruise on her neck. The abrasions on Raver's body were the result of pushing or pulling of her body; and the wounds were not caused by an animal, according to a medico-legal death investigator and wound identification expert at the medical examiner's office. Raver's body was found undressed from the waist down with her legs spread apart on the ground, and a glistening liquid was found on her thighs, which was collected on swabs and preserved as evidence.

In performing a physical examination of Raver's body, Dr. Field recovered evidence swabs, including from inside Raver's vagina, because Raver was a possible victim of sexual assault. Dr. Field also took pubic combings from Raver to remove any

hair foreign to Raver that may be present.  The evidence was sealed and delivered to the Fairfax County police.

Fulton was also killed by a single gunshot, which entered the middle of his back, traveled in a downward trajectory, and remained in his body.

The bullets were recovered from Raver and Fulton's bodies and transferred through a documented chain of evidence to Julien J. Mason, Jr., a forensic scientist in the field of firearms and toolmark identification.  Mason examined the bullets and testified that the bullets were .38 or .357 caliber bullets fired from the same weapon, a revolver.

Although Raver's car was not located by Fairfax County police, it was next observed in New York City just prior to noon on December 5, 1988, the day before the bodies were found.  A New York City patrol officer ticketed Raver's car while it was parked in Queens, New York.  Months later, when Raver's mother received a past due parking ticket on the car, it was then secured in a New York City police garage and finally examined by Fairfax County police.  Raver's car had been "stripped totally" and the interior was "trashed."  No "readily visible" evidence was observed.

Shortly after the murders, the vaginal swabs obtained from Raver's body were examined and tested in an effort to identify a suspect.  In January 1989, biological evidence

obtained from the physical examination of Raver was delivered to Lifecodes Corporation in New York for DNA profiling, a new technology at the time. The analysis was to be used in the event a suspect was identified. Lifecodes extracted DNA from Raver's vaginal swabs and found DNA foreign to Raver, but at that time there was no suspect for a comparison to be made. The Fairfax County police received the returned evidence in June 1989.

Ten years later in 1999, biological evidence was examined by Carol Palmer, Group Supervisor in the Forensic Biology Section of the Virginia Department of Forensic Science Laboratory (the laboratory) and an expert in the field of DNA analysis. Palmer testified that

> [t]here came a time [in 1999 when the laboratory] had a type of . . . DNA analysis, that could be used on cases that had been deemed cold cases, cases that had been worked in previous years where now DNA testing might be able to provide additional information.

Palmer testified that DNA testing can be used to make an association or disassociation between individuals and samples or items collected from crime scenes.

The biological evidence Palmer examined included a sample of Raver's blood and vaginal swabs from Raver. Palmer obtained a foreign DNA profile from the vaginal swab. When Palmer compared the foreign DNA profile from Raver's vaginal

swab to a DNA profile obtained from a sample of Fulton's blood, Fulton was eliminated as the contributor of the foreign profile.

In September 2005, almost 17 years after the murders, when Prieto was identified as a suspect, a cheek buccal swab was obtained from Prieto for the purpose of collecting DNA material.  In October 2005, Palmer compared the foreign DNA profile from Raver's vaginal swab and the swabs collected from Raver's thighs at the scene with the DNA profile obtained from Prieto.  Palmer was unable to eliminate Prieto as the contributor of the foreign DNA profile from Raver's vaginal swabs and from swabs collected from Raver's thighs.  Palmer testified that she "would expect to find this profile only once in greater than the world population," and that the probability of finding the same DNA profile as found on the vaginal swab was one in 90 quadrillion in the Caucasian population, one in 900 quadrillion in the black population, and one in one quadrillion in the Hispanic population.

### B. Penalty Phase Evidence

Upon Prieto's conviction by the jury of two counts of capital murder, the court conducted a sentencing proceeding as required by Code § 19.2-264.4.  Prieto had timely provided notice of his intent to present expert testimony to support his claim of mental retardation pursuant to Code § 19.2-264.3:

10

1.1(C), and the issue of Prieto's mental retardation was determined by the jury as part of the sentencing proceeding in his bifurcated trial.

At the sentencing proceeding, the Commonwealth introduced evidence of Prieto's prior convictions. The prior convictions included a drive-by shooting of three people on or about August 25, 1984 and an escape committed on or about August 16, 1985. The evidence of prior convictions also included a series of crimes committed in California on or about September 2, 1990: the rape and murder of a 15 year old girl, two attempted murders, two additional rapes, three kidnappings, two robberies, two attempted robberies, and possession of a firearm by a felon. Prieto was sentenced to death in California for the murder of the 15 year old girl, who was found in a remote, open field, partially unclothed, and lying on her back with her legs spread apart. She was killed by a single gunshot wound.

Evidence was also introduced that Prieto raped and murdered Veronica Jefferson, a young professional woman, whose naked body was discovered on May 11, 1988 on the grounds of an elementary school in Arlington, Virginia. Jefferson died from a single gunshot wound to the chest. Prieto's DNA profile could not be eliminated as the source of genetic material

obtained from vaginal swabs from Jefferson and from her jacket.

The Commonwealth presented testimony from eight family members concerning the impact of the deaths of Raver and Fulton.  In mitigation, Prieto presented five family members to describe his difficult upbringing in El Salvador and how he moved to California as a teenager and became involved with gangs.  The jury also heard from Prieto's priest from prison in California.

Dr. Ricardo Weinstein testified that Prieto was mentally retarded.  Dr. Pablo Stewart testified that Prieto suffered from post-traumatic stress disorder as a result of his experiences in El Salvador.  Dr. James R. Merikangas testified that Prieto suffered from brain damage affecting his right frontal lobe, resulting in reduced impulse control.  Dr. Leigh D. Hagen testified for the Commonwealth that Prieto was not mentally retarded within the meaning of Code § 19.2-264.3:1.1(A).

### III.  ASSIGNMENTS OF ERROR WAIVED OR DEFAULTED

Although Prieto presents 82 assignments of error in this appeal,[2] a number of the assignments will not be analyzed.  We will dispose of those assignments of error that Prieto did not

---

[2] The assignments of error are designated by the number Prieto has given them.

adequately preserve for appeal and therefore will not be considered.

On brief, Prieto concedes that he has only briefed and argued a portion of his assignments of error. Prieto failed to provide an argument for assignments of error 1, 2, 3, 5, 7, 8, 9, 10, 11, 12, 16, 19, 20, 21, 23, 24, 44, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 62, 63, 64, 65, 66, 70, 71, 72, 73, 74, 76, and 77. Therefore, Prieto is deemed to have waived these assignments of error. Rules 5:17(c)(4) and 5:27; see also Jay v. Commonwealth, 275 Va. 510, 519-20, 659 S.E.2d 311, 316-17 (2008) (citing Atkins v. Commonwealth, 272 Va. 144, 149, 631 S.E.2d 93, 95 (2006)); Muhammad v. Commonwealth, 269 Va. 451, 477, 619 S.E.2d 16, 30 (2005), cert. denied, 547 U.S. 1136 (2006); Elliott v. Commonwealth, 267 Va. 396, 422, 593 S.E.2d 270, 286 (2004), cert. denied, 543 U.S. 1081 (2005); Burns v. Commonwealth, 261 Va. 307, 318, 541 S.E.2d 872, 880, cert. denied, 534 U.S. 1043 (2001).

Prieto maintains that he addressed certain assignments of error in some of his arguments. A reading of those arguments, however, demonstrates that they do not address the assignments of error Prieto claims they do. As a result of Prieto's failure to properly brief and argue assignments of error 4, 17, 18, 22, 26, 28, 31, 32, 35, 36, 38(a), (b), and (c), 39, 40, 41, 45, 46, 61, 80, 81, they have been waived. Rules

13

5:17(c)(4) and 5:27; see also Jay, 257 Va. at 519-20, 659 S.E.2d at 316-17.

Prieto failed to cite to any authority in support of his arguments concerning assignments of error 30 and 34. Because Prieto did not adequately brief these assignments of error, they are considered waived. Rules 5:17(c)(4) and 5:27; see also Powell v. Commonwealth, 267 Va. 107, 135, 590 S.E.2d 537, 554, cert. denied, 543 U.S. 892 (2004).

The arguments Prieto makes in support of assignments of error 25, 27, 38(d) and (e) simply restate the assignment itself. We have previously held that "[s]uch a statement does not constitute an argument in support of the error assigned." Teleguz v. Commonwealth, 273 Va. 458, 473, 643 S.E.2d 708, 718 (2007). As a result, Prieto has waived those assignments of error. Rule 5:17(c); see also Muhammad, 269 Va. at 478-79, 619 S.E.2d at 31.

Lastly, we will not consider assignment of error 69, as it is procedurally defaulted. Prieto contends that the circuit court erred in its response to a question from the jury, made during the sentencing phase. The jury asked: "Your Honor, regarding the first aggravating circumstance: 'constitute a continuing serious threat to society;' are we to consider that he is already never likely to leave prison or should we consider the possibility of him walking the street

14

as a free man?"  The court responded in writing:  "I refer you back to the evidence that has been admitted and the instructions of law."  During the discussion of the jury's question, Prieto argued that the jury should be guided to Jury Instruction 7 and told that Prieto could only be sentenced to death or imprisonment for life without the possibility of parole.[3]  On appeal, however, Prieto argues that the jury's question shows that they did not understand the concept of "future dangerousness" and, as a result, the court should have responded that "the probability referred to in [Code] § 19.2-264.2 means 'a likelihood substantially greater than a mere possibility that [the defendant] would commit similar crimes in the future.' "  Since Prieto failed to raise this argument at trial, we will not consider it on appeal.  Rule 5:25; Teleguz, 273 Va. at 470, 643 S.E.2d at 716.

IV. DENIAL OF HUNG JURY AND MOTION TO IMPOSE A
LIFE SENTENCE IN PRIETO I, MISTRIAL FOR MANIFEST
NECESSITY, AND DENIAL OF MOTION TO BAR RETRIAL IN PRIETO II

We next address issues concerning whether the circuit court erred in denying Prieto's motion for a mistrial in Prieto I when the jury raised the issue whether it could reach a unanimous determination regarding mental retardation and in denying Prieto's motion to impose a life sentence.  We also

---

[3] Jury Instruction 7 reads:  "The words 'imprisonment for life' means imprisonment for life without possibility of

15

consider the court's declaration of a mistrial for manifest necessity on the grounds of juror misconduct and the consequent retrial of the entire case.

In Prieto I, the circuit court did not bifurcate the trial into two separate phases for determination of guilt or innocence and sentencing. Instead, the circuit court trifurcated the first trial into three phases: (1) determination of innocence or guilt, (2) determination of mental retardation, and (3) sentencing. During jury deliberations on the issue of mental retardation, the jury foreman provided the circuit court with a note stating: "We have been unable to get a unanimous decision. It appears we will be unable to." At the same time, the court also received a note from Juror D, which read:

> Again, I feel that I am being pressure [sic] by my fellow juror[s] to go along with their decision. I am the only one differing from the the [sic] rest. My decision this time is firm and final and deliberation has crossed the line into peer pressure. Please end this deliberation.

Upon being notified of these comments, Prieto's counsel moved to dismiss the jury on the grounds that the comments of both the jury foreman and Juror D made it clear that the jury would be unable to reach a verdict on the issue of mental

---

parole."

16

retardation, and therefore, an "Allen charge" would not help the jury reach a decision through the deliberative process. Rather, defense counsel contended an "Allen charge" would only force or compel Juror D to a different decision. Defense counsel argued that a life sentence should be imposed pursuant to Code § 19.2-264.4(E).[4]

The Commonwealth argued that due to the length of time the jury had been involved in the case and its apparent split, the jury should at least be given a modified "Allen charge." The Commonwealth also argued that because Prieto bore the burden to convince the jury on the issue of mental retardation and failed to meet that burden, the trial should proceed to sentencing.

The circuit court denied Prieto's motion for a mistrial on the grounds that the jury was hung and gave a modified "Allen charge," which reminded the jury to resume its deliberations following lunch.

Before returning to the jury room to continue deliberations following lunch, Juror D submitted a second note to the circuit court, stating:

> Now, during the deliberation of whether defendant is mentally retarded or not, I am once again facing absolute pressure to go along with the

---

[4] Pursuant to Code § 19.2-264.4(E), "[i]n the event the jury cannot agree as to the penalty, the court shall dismiss the jury, and impose a sentence of imprisonment for life."

> other jurors . . . I . . . AGAIN ask that your
> Honor end this deliberation. . . . Since I don't
> believe that the prosecution has proved that the
> defendant is guilty of the capital murder
> charges, I kindly ask the court to immediately
> dismiss me.

The circuit court adjourned the jury until the following morning and addressed the issue of a mistrial with the parties.

Prieto's counsel asserted that the guilt phase of the trial had concluded and the sentencing phase was taking place, that despite trifurcating "mental retardation into being different from the penalty phase, . . . the reality is that we're in the penalty phase. We're not in the guilt and innocence phase. That's done. It's been determined and so there's only two stages to the trial." Prieto contended that the jury was hung on the issue of mental retardation, as part of the sentencing phase, and the circuit court should therefore impose a sentence of life without parole pursuant to Code § 19.2-264.4(E). The Commonwealth argued that the trial was not yet in the sentencing phase, that the jury had received no penalty evidence, and although the jury "[could not] agree on retardation, [it was] hardly hung on penalty."

The circuit court made a factual determination that Juror D did not follow the "Allen charge" when instead of returning to the jury room to continue deliberations after lunch, he

18

gave the deputy sheriff his second note. The circuit court held that Juror D engaged in clear misconduct by "not following [the court's] instructions to maintain his honest convictions" during the guilt phase and later "failing to abide by the Allen charge." The circuit court declared a mistrial due to manifest necessity resulting from Juror D's misconduct.

At the outset of the retrial in Prieto II, Prieto filed a motion to bar retrial and to impose a life sentence, arguing that the jury's deadlock on the issue of mental retardation was akin to a deadlock on the issue of penalty, and therefore the court must impose a life sentence as the death penalty was precluded. The circuit court denied Prieto's motion, stating that "[t]he basis for the retrial here is that Judge [Dennis] Smith [who presided over Prieto I] declared a mistrial based on manifest necessity. And I find that there was a manifest necessity and that Judge Smith had no choice but to declare a mistrial and start this case from scratch." The circuit court cited as grounds of misconduct by Juror D his failure to vote his conscience in the guilt phase and to follow the "Allen charge" to resume and continue deliberations.

The circuit court, in noting that Prieto had not challenged Judge Smith's factual findings, stated that the finding of misconduct was based upon three factors:

19

> (1) Judge Smith's contemporaneous finding that Juror D refused to resume deliberations;
> (2) Testimony from a deputy sheriff that he received Juror D's second note before deliberations resumed following the "Allen charge" and the lunch recess; and
> (3) The court clerk's notes corroborating Judge Smith's determination of the sequence of events.

The circuit court also concluded that the jury during Prieto I was not hung on the issue of mental retardation when the "Allen charge" was given.

On appeal, Prieto assigns error to the circuit court's denial of his motion to bar a retrial and impose a life sentence. Prieto maintains that the circuit court erred in declaring a mistrial in Prieto I and in allowing the Commonwealth to seek the death penalty in Prieto II. Prieto contends that when the jury informed the circuit court that they could not reach a unanimous verdict on the issue of mental retardation in Prieto I, the jury had deadlocked on the appropriate sentence. Therefore, Prieto argues the circuit court should have sentenced him to life without parole, in accordance with Code § 19.2-264.4(E), and barred the Commonwealth from retrying him for capital murder in Prieto II. Prieto further asserts that because it was clear that the jury had deadlocked on the issue of mental retardation when the circuit court proceeded to give the jury an "Allen charge," giving the "Allen charge" was unduly coercive.

20

Prieto argues that because Juror D said that his decision at "this time is firm and final" and then opted to end his participation in the deliberations, the jury was hung and it made no difference whether Juror D followed the circuit court's instruction to continue deliberations.

Prieto further argues that since mental retardation is a bar to a death sentence, if any juror concludes that a defendant is mentally retarded, then that jury can never reach a unanimous verdict for death. Prieto continues, if there is no unanimity for death, then there can be no death sentence.

Finally, Prieto argues that it was not Juror D's alleged misconduct that created a manifest necessity for a mistrial. According to Prieto, if any manifest necessity for a mistrial existed in Prieto I, it resulted from the circuit court's own error in failing to declare the jury deadlocked when the court received the notes from the jury foreman and Juror D, and in delivering an unduly coercive "Allen charge."

The Commonwealth argues that the circuit court in Prieto I did not err in declining to declare a hung jury on the issue of mental retardation. The Commonwealth contends that the circuit court also did not abuse its discretion by giving an "Allen charge." According to the Commonwealth, the circuit court properly found that the jury had ceased to function as a jury even before it returned the guilt stage verdicts because

21

of Juror D's misconduct.  The Commonwealth argues that Juror D's misconduct continued when he refused to comply with the "Allen charge" by refusing to continue deliberations.  The Commonwealth asserts that the circuit court was left with an incomplete jury to continue deliberations and a mistrial for manifest necessity was the only appropriate alternative.

### A.  Denial of Mistrial Based Upon Motion That Jury Was Unable To Agree On A Verdict – Hung Jury

We first address whether the circuit court abused its discretion in denying Prieto's motion for a mistrial in Prieto I upon receipt of the notes from the jury foreman and Juror D. The circuit court is authorized to discharge the jury either when it appears that the jurors cannot agree on a verdict – are hung - or when there is a manifest necessity for such discharge.  Code § 8.01-361.  The power to discharge a jury is discretionary and the court must exercise this power carefully, according to the circumstances of the case.  Mack v. Commonwealth, 177 Va. 921, 926, 15 S.E.2d 62, 64 (1941). "The object of the law is to obtain a fair and just verdict, and whenever it shall appear to the court that the jury impanelled cannot render such a verdict, it ought to be discharged, and another jury impanelled."  Id. at 927, 15 S.E.2d at 64.

22

When a jury is unable to reach a unanimous verdict, it is within the sound discretion of the circuit court to determine at what point a mistrial should be granted because the jury is hung.  See Smith v. Commonwealth, 239 Va. 243, 267, 389 S.E.2d 871, 884 (1990), cert. denied, 498 U.S. 881 (1990), cert. denied, 506 U.S. 848 (1992).  The circuit court is authorized to allow deliberations to continue, in consideration of the seriousness of the matter to the community, and the length and complexity of the trial proceedings.  See Eaton v. Commonwealth, 240 Va. 236, 258-59, 397 S.E.2d 385, 398-99 (1990), cert. denied, 502 U.S. 824 (1991).  Among the alternatives available to the circuit court is the provision of an "Allen charge," reminding the jury of the need to reach a verdict if one can be reached without any individual juror giving up his or her conviction.  Poindexter v. Commonwealth, 213 Va. 212, 215, 191 S.E.2d 200, 203 (1972).

In a capital proceeding, the citizens of this Commonwealth have a strong interest in having a jury express the conscience of the community on the ultimate question of life or death, and the court is entitled to direct the jury to continue its deliberations for a reasonable time even after the jury has indicated that it is deadlocked.  Eaton, 240 Va. at 259, 397 S.E.2d at 399; Lowenfield v. Phelps, 484 U.S. 231, 238 (1988).

23

The imposition of a life sentence upon the jury's failure to reach a unanimous verdict at the sentencing stage pursuant to Code § 19.2-264.4(E) is mandated only after a reasonable period of deliberation, and the trial judge determines that further deliberations would be fruitless and the jury's deadlock is final.  Eaton, 240 Va. at 259, 397 S.E.2d at 399.

The circuit court did not abuse its discretion in denying Prieto's motion to declare a mistrial on the grounds that the jury was hung because it could not agree on a verdict.  Among the considerations relevant to the issue of whether further deliberation would be fruitless were the following:

(1)  The trial had been in progress for approximately four weeks;
(2)  The jury had successfully arrived at a verdict of guilty in the guilt or innocence phase;
(3)  The jury had been deliberating the determination of mental retardation for approximately a day and a half; and
(4)  The jury foreman's note did not state that the jury was unable to reach a unanimous decision, only that it appeared to be unable to do so.

Based on these circumstances, the circuit court acted within its discretion in instructing the jury to continue deliberations.

The language from an excerpt of a portion of the modified "Allen charge" addresses some of the reasons the circuit court instructed the jury to continue its deliberations:

This is an important case.  There appears no reason to believe either side could try the

24

case better or more exhaustively than it has been tried before you. . . .

[T]here appears no reason to believe that the case could ever be submitted to twelve citizens who were more conscientious, more impartial, and more competent to decide it, or that more or clearer evidence could be produced on behalf of either side. . . .

It is your duty as jurors, however, to consult with one another and to deliberate with a view towards reaching a unanimous agreement if you can do so without doing violence to your individual judgment. . . .

Remember at all times that no juror is expected to yield a conscientious belief he or she may have as to the weight or the effect of the evidence, but remember also that in a full deliberation and consideration of all the evidence in the case, it is your duty to agree upon the verdict, if you can do so without violating your individual judgment and your conscious [sic].

Prieto argues that Juror D's first note indicated that he was the only dissenter, his decision was "firm and final," and deliberations had crossed into peer pressure. However, the circuit court interpreted the two notes differently when Judge Smith contrasted Juror D's note with the foreman's note and stated: "[I]t doesn't sound to me like it's a jury that's trying to force him when they say it appears we're unable to."

We hold the circuit court did not abuse its discretion in denying Prieto's motion for a mistrial based on Prieto's argument that the jury was hung due to an inability to reach a verdict. The factual findings made by Judge Smith support his

25

exercise of discretion in allowing the jury more time in its deliberations in this lengthy, complex and important case.

## B. Mistrial For Manifest Necessity

Therefore, the next issue we address is whether the circuit court abused its discretion in granting a mistrial for manifest necessity and granting a retrial of the entire case. We review this matter for an abuse of discretion. Smith, 239 Va. at 267, 389 S.E.2d at 884.

The granting of a mistrial for manifest necessity may become necessary when the jury ceases to function as a jury. When Juror D refused to continue deliberations, and in effect impeached his verdict rendered in the guilt or innocence phase, the circuit court was faced with the novel issue whether to continue a trial when juror misconduct not only affected the sentencing phase, but also the prior phase of guilt or innocence.

A circuit court has the authority to discharge the jury when it determines there exits a manifest necessity to do so. Code § 8.01-361. "In determining whether manifest necessity exists, a trial court is vested with broad discretion." Smith, 239 Va. at 267, 389 S.E.2d at 884. Absent a showing that the circuit court abused its discretion by granting a mistrial, this Court will not disturb the circuit court's

26

ruling on appeal.  Cheng v. Commonwealth, 240 Va. 26, 40, 393 S.E.2d 599, 607 (1990).

In assessing whether manifest necessity existed, the circuit court considered the fact that Juror D refused to follow the court's instructions in two respects.  First, Juror D revealed that he had not "maintain[ed] his honest convictions" during the guilt phase when he expressed that he did not believe the Commonwealth had proved that Prieto was guilty of capital murder after the jury had returned a unanimous guilty verdict.  Secondly, Juror D refused to follow the "Allen charge" when he gave the circuit court a note prior to returning to the jury room after lunch which clearly stated both Juror D's belief that Prieto was not guilty of capital murder as well as Juror D's unwillingness to continue deliberations.

Based on these circumstances, the circuit court made a factual determination that Juror D did not follow the "Allen charge" and had engaged in clear misconduct.  Prieto has not assigned error to these factual determinations, which find ample support in the record.  We hold that the circuit court did not abuse its discretion when it declared a mistrial due to manifest necessity arising out of juror misconduct, discharged the jury, and granted a retrial of the entire case.

C. Motion To Bar Retrial In Prieto II

27

Prieto's motion to bar a retrial in Prieto II is based upon his argument that the jury was unable to reach a verdict, or was hung, in the penalty phase of Prieto I, which required a sentence of life imprisonment.  Prieto also argues that a deadlock in the mental retardation phase constitutes a deadlock under Code § 19.2-264.4(E), even if the issue of mental retardation was separated from the rest of the sentencing phase.

A sentence of life without parole is only mandated if the jury is deadlocked in the sentencing phase of a capital murder trial.  Code § 19.2-264.4(E).  We need not resolve the issue whether a jury that is deadlocked on the determination of mental retardation "cannot agree as to the penalty" pursuant to Code § 19.2-264.4(E) when that issue has been separated within the sentencing phase because of our decision that the jury in Prieto I was not deadlocked.  The jury was not deadlocked because it was in a position to continue deliberations if not for Juror D's failure to follow the circuit court's "Allen charge" and his impeachment of his guilty verdict in the guilt or innocence phase.  We find no error in the circuit court's denial of Prieto's motion to bar a retrial and impose a life sentence.

V.    DETERMINATION OF MENTAL RETARDATION

28

We next address Prieto's argument that the circuit court erred in not requiring that the issue of mental retardation be determined separately from the other sentencing issues in Prieto II. We begin with the proposition that there is no statutory requirement that the issue of mental retardation be determined separately from the other sentencing issues in the penalty phase. Virginia's statutory scheme provides that when the issue of the defendant's mental retardation is properly before the jury, that issue shall be determined as part of the sentencing phase of the bifurcated trial. Code § 19.2-264.3:1.1(C).

Prior to the second trial, Prieto filed a motion for pretrial determination of mental retardation based upon his argument that Rule 3A:9(b)(2) provides that any defense or objection that is capable of determination without a trial of the general issue may be raised by motion before trial. Prieto further argued that a pretrial determination of mental retardation was not precluded by statute. The circuit court denied Prieto's motion for a pretrial determination of mental retardation as being clearly precluded by Code § 19.2-264.3:1.1(C), which provides that:

> In any case in which the offense may be
> punishable by death and is tried before a
> jury, the issue of mental retardation, if
> raised by the defendant in accordance with the
> notice provisions of subsection E of § 19.2-

> 264.3:1.2, *shall be determined by the jury as*
> *part of the sentencing proceeding required by*
> *§ 19.2-264.4.*

(Emphasis added).

Prieto then moved to bifurcate the sentencing proceeding as the circuit court did in Prieto I by separating the issue of mental retardation from sentencing. Prieto sought a full hearing on mental retardation with "openings, closings, and evidence in between." The circuit court denied Prieto's motion for a separate phase on the determination of mental retardation. The circuit court determined that the plain meaning of Code § 19.2-264.3:1.1 provides that the determination of mental retardation must be part of the sentencing phase of trial.

Prieto argues there are two mechanisms the circuit court could have employed to assure that his mental retardation claims would be considered on the merits without the taint from evidence of future dangerousness, evidence of vileness, or victim impact evidence. Prieto asserts the circuit court could have either directed a pretrial determination of the issue of mental retardation or bifurcated the sentencing phase of the trial, limiting the evidence to that regarding mental retardation. Prieto contends the circuit court erred in failing to employ one of these mechanisms to the consideration of Prieto's mental retardation. As a result, according to

Prieto, the jury was improperly influenced in its consideration of mental retardation by irrelevant evidence.

The Commonwealth responds that the circuit court properly rejected Prieto's motions to decide the issue of mental retardation prior to trial based upon the clear language of Code § 19.2-264.3:1.1(C).

We agree with the Commonwealth's arguments concerning the application of Code § 19.2-264.3:1.1(C). The language in the statute directing that the issue of mental retardation "shall be determined by the jury as part of the sentencing proceeding required by § 19.2-264.4" clearly mandates that the issue of mental retardation be determined by the jury as part of the sentencing phase. Therefore, the circuit court did not err in denying Prieto's motion for a pretrial determination of mental retardation.

The circuit court also did not err when it denied Prieto's motion to bifurcate the sentencing phase to include a separate phase on mental retardation. No statute required the circuit court to bifurcate the sentencing phase to have a separate phase solely to address the issue of mental retardation. We hold that the issue of mental retardation is not to be separated from the issue of punishment, but is to be determined by the jury as part of the sentencing phase of the bifurcated trial.

31

## VI. LOST EVIDENCE AND SUFFICIENCY OF THE EVIDENCE

Among the items of physical evidence that the medical examiner preserved during her examination of Raver's body were two hairs obtained from combings of Raver's pubic area. These two hairs were examined shortly after their discovery and were determined to be foreign to Raver. No further examination was conducted because there was no suspect's hair to which a comparison could be made. When Prieto was developed as a suspect almost 17 years later, the hairs were missing.

When Dr. Field, the medical examiner, performed her physical examination of Raver's body and recovered evidence swabs from inside Raver's vagina, she also took pubic combings from Raver to remove any foreign hair that may be present. According to Dr. Field, in a possible victim of a sexual assault, pubic combings are conducted to remove any foreign hair that might be present for comparison with a suspected assailant's hair.

In December 1988, within a week after Raver's body was discovered, Myron T. Scholberg, a forensic scientist for the Commonwealth of Virginia and a hair, fiber, and fabric expert, prepared a certificate of analysis concerning the results of hair examinations he conducted of Raver and Fulton. The Fairfax County police provided Scholberg with Raver's pubic hair combings, her known head hairs and pubic hairs, and a

hair that was removed from a vaginal swab.  Scholberg also received Fulton's head hairs and pubic hairs.  At the time of Scholberg's examination, there was no suspect, so he had nothing with which to compare the samples.  Scholberg was asked to determine if there were any hairs foreign to Raver in her pubic hair combings.  According to Scholberg, at that time, DNA testing was not used by the laboratory.

Scholberg determined that Raver's known hairs were Caucasian, and observed two hairs of Negroid origin in her pubic hair combings, which could not have originated from Raver.  One of the Negroid hairs was a head hair and the other was a head hair fragment.  Scholberg testified that the head hair fragment was too small and did not contain enough of the hair or its characteristics to compare with a known sample. According to Scholberg, the head hair was a full-length hair with a root and was suitable for comparison purposes. However, Scholberg determined that this full-length hair was not forcibly removed, and therefore did not have a piece of tissue on the end of the root that could later be used for DNA analysis.  Scholberg testified that he could not exclude the possibility that the hairs he examined were Hispanic in origin.

Scholberg's notes do not indicate he examined the hair on the vaginal swab.  He was asked to report any foreign hairs,

and he did not report that the hair on the vaginal swab was foreign to Raver. Scholberg also prepared a second report which indicated "examinations [were] being held in abeyance pending possible additional known hairs from a suspect." In January 1989, when Scholberg was finished with his analysis of the hairs, Fairfax County Police Officer James F. Mowatt collected the recovered hairs in a sealed condition from the laboratory and took them to the police property room.

On September 21, 2005, almost 17 years after the murders, Fairfax County homicide detective Robert J. Murphy went to the police property room and retrieved a brown opaque envelope, which was the original container believed to contain the hair from Raver's pubic combings. He transported it to the laboratory and submitted it to Carol Palmer, the forensic scientist who was going to look at the hair and determine whether it would be suitable for DNA testing. Two days later, Palmer called Detective Murphy and told him that the envelope was empty. That same day, Detective Murphy went first to the laboratory and then to the police property room where he searched for the missing hair evidence, but could not find it. He located the envelope designated to contain the hair from the vaginal swab and transported it to the laboratory, but later learned the vaginal swab hair was missing as well.

Detective Murphy, along with another detective and property officers, searched the entire property room on four separate occasions. They looked at every single item of evidence in the case. At Detective Murphy's direction, the laboratory personnel searched the entire laboratory, including lockers and old property files. Despite the intensive search, the missing evidence was never located.

After Prieto became a suspect in the murders, a sample of his head hair was obtained for examination. Charles Linch, a hair examiner for the Commonwealth of Virginia, examined the sample of Prieto's head hair for purposes of classifying the hairs' race characteristics. Linch concluded that Prieto's head hairs were mixed, with Mongoloid and Caucasian characteristics. When Linch was asked if in his practice he would make an opinion based on one hair and a fragment of another, Linch said he would issue a report saying it was "characteristically this or characteristically that." He continued, "[i]f I say characteristically Negroid, that wouldn't mean it had to come from a black person. But it had Negroid characteristics, predominant Negroid characteristics. We all have mixtures in our head hair." According to Linch, "[n]one of [the hairs] had characteristically Negroid pigmentation. . . . [I]f these hairs were found individually [and I had] just a piece of one of the heavy pigmented ones, I

35

might could [sic] make the error and call it a Negroid hair." Linch's report concluded that "[t]he head hairs exhibited are characteristically Mongoloid and characteristically mixed Mongoloid[/]Caucasian, racial characteristics."

Linch also testified about the transient nature of hair, which can be transferred from person to person. Linch testified that when an expert finds another person's hair on a victim, there is no way the expert can determine how it got there unless the expert saw it either fall or be transferred.

Prieto filed a motion to bar capital punishment due to the loss of the hair evidence and the impact he maintains its unavailability had on the "triggerman" theory. The circuit court denied Prieto's motion to bar the death penalty based on the loss of evidence by the Commonwealth. The circuit court noted that "[n]o one is suggesting [the loss of the evidence] was done for bad purposes." Furthermore, the circuit court stated: "In this case, there is zero evidence at all; zero. Not a scintilla of evidence that this evidence was lost for any bad faith purpose, maliciously, or intentionally. In fact, the government literally turned the property room upside down looking for this evidence." The circuit court continued:

> So, I don't see any evidence that it was done
> intentionally, and absent evidence that it was
> done intentionally, or in bad faith, or
> maliciously . . . I cannot understand why the
> defense would be entitled to an adverse

inference, because there is no reason at all
for me to believe that there is anything about
the fact that this evidence is missing that
would warrant an adverse inference.

On appeal, Prieto assigns error to four determinations by

the circuit court relating to the lost hair evidence and the

sufficiency of the evidence to convict Prieto as an immediate

perpetrator or "triggerman," which is required for Prieto's

conviction as a principal in the first degree, making him

eligible for the death penalty.  Code § 18.2-18.  Prieto

argues that the circuit court erred in

(1)  failing to strike the death penalty at the close of
     the Commonwealth's case-in-chief because the
     Commonwealth failed to prove Prieto was the
     "triggerman";
(2)  denying his motion to bar the death penalty because
     the Commonwealth lost evidence crucial to his
     defense;
(3)  not dismissing the charges against him because the
     Commonwealth lost the foreign hairs from Raver's
     pubic combings, which he contends were exculpatory
     evidence; and
(4)  failing to instruct the jury regarding an adverse
     inference to be drawn against the Commonwealth due
     to its loss of the evidence.

Prieto also argues that the Commonwealth violated his due

process rights by losing exculpatory evidence, and that he was

not required to show bad faith to establish a due process

violation.  Prieto maintains that there are two categories of

evidence which, if lost, can serve as the basis for a due

process violation:  (1) "material exculpatory evidence," and

(2) "potentially useful evidence."

Prieto asserts that while the loss of evidence that is merely potentially useful requires a showing of bad faith to establish a constitutional violation, the loss of apparently exculpatory evidence violates due process, even in the absence of bad faith. According to Prieto, the lost hairs were apparently exculpatory. Prieto contends that either through a comparison between his own hair and the lost hairs or through DNA samples derived from the full-length hair, he could have shown that the hairs were not his and that another perpetrator was involved. Prieto argues that the existence of another perpetrator would have rendered the evidence presented insufficient to establish him as the immediate perpetrator and thus he would not have been subject to the death penalty. Prieto asserts that the circuit court erred by not, at a minimum, giving an adverse inference instruction to the jury.

The Commonwealth contends the circuit court did not err in denying Prieto's motions for relief concerning the loss of evidence. The Commonwealth argues that because the lost hairs were only potentially useful evidence, Prieto must show bad faith to constitute a denial of due process of law. According to the Commonwealth, Prieto did not dispute the circuit court's finding that there was no bad faith on the part of the investigators or prosecutors involved in the loss of only potentially exculpatory evidence. The Commonwealth originally

sought to have the hair examined because the hair was potentially inculpatory, and argues that Prieto was not prejudiced by the loss of the hair. According to the Commonwealth, because the hair was missing and there was evidence that the hair contained Negroid characteristics, Prieto had the opportunity to argue to the jury that the hair established the existence of another perpetrator.

## A. Lost Evidence

The Commonwealth does not have an absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular proceeding. Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Evidence obtained by the police prior to the identification of a suspect under some circumstances may be inculpatory or exculpatory, and whether it is exculpatory cannot be determined until a comparison can be made with an identified suspect. Such evidence is potentially exculpatory, and not apparently exculpatory. If the potentially exculpatory evidence is lost prior to the determination of a suspect, unless there is bad faith on the part of the Commonwealth, there is no due process violation. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id.

A defendant is not entitled to an adverse inference instruction due to the loss of evidence that only potentially has exculpatory value, when the loss is without fault by the Commonwealth. The circuit court explicitly stated that the missing evidence was as likely to hurt Prieto as help him. Because the evidence was only potentially exculpatory, Prieto was required to show bad faith in order to successfully lodge a due process violation claim. The circuit court found that the evidence was not lost as a result of bad faith by the Commonwealth, and Prieto does not dispute that finding.

The circuit court's findings are supported by the evidence, which renders the exculpatory value of the lost hair inconclusive. Scholberg classified Prieto's hair as Mongoloid/Caucasian, but testified that he could not exclude the possibility that the lost hairs were Hispanic in origin.

Linch, whose analysis took place after the hairs were lost, also characterized Prieto's hair as mixed Mongoloid and Caucasian. However, Linch testified that if Prieto's individual hairs or only a piece of a heavily pigmented hair was found, Linch might mistakenly call it a Negroid hair. It is unclear from the record whether DNA analysis could have been performed on the hairs if they had not been lost.

Additional support for the circuit court's finding that the lost hairs from Raver's pubic combings were only

potentially exculpatory comes from the fact that the record does not reflect the whereabouts of the hairs from the years 1989 to 2005.  Since the hairs were last observed in 1989 when Scholberg examined them prior to the evidence envelope being sealed, and they were not present in 2005 when the evidence envelope was next unsealed, the reasonable inference to be drawn is that the hairs were lost at some time prior to 2005 when Prieto's DNA sample was taken for comparison purposes. The hairs could not have apparent exculpatory value when there was no suspect with whom a comparison could be made.  In fact, the Commonwealth believed there was inculpatory value to these hairs, which was why DNA analysis was attempted.  Prieto himself referred to the missing evidence as "potentially exculpatory" in his motion to bar the death penalty, though he now argues on appeal that the lost hairs had apparent exculpatory value.

We have previously addressed the issue of the loss of potentially useful evidence.  We held in Lovitt v. Warden, Sussex I State Prison, 266 Va. 216, 241, 585 S.E.2d 801, 815 (2003), cert. denied, 541 U.S. 1006 (2004) (internal citations omitted), that

> under the Youngblood standard, a state's failure
> to preserve potentially useful evidence does not
> constitute a denial of due process unless a
> defendant can show bad faith on the part of the
> state.  The presence or absence of bad faith by

the state depends on whether agents of the state had knowledge of the exculpatory value of the evidence when it was lost or destroyed. Thus, the possibility that evidence could have exculpated a defendant depending on future testing results is not enough to satisfy the constitutional standard of materiality.

It is undisputed that there was no bad faith on the part of the Commonwealth. Defense counsel again conceded the lack of bad faith at oral argument on appeal. Therefore, since the lost hairs were only potentially useful evidence and the Commonwealth did not act in bad faith, the loss of the evidence does not constitute a due process violation that would require a reversal of Prieto's convictions. We hold that the circuit court properly denied Prieto's motion to bar the death penalty and correctly refused to dismiss the charges against Prieto due to the loss of the hairs.

## B. Sufficiency Of The Evidence That Prieto Was The Immediate Perpetrator

On appeal, Prieto argues that the evidence of foreign hairs supports his argument that there must have been another perpetrator present at the scene; and that although the evidence supports Prieto's conviction for rape, the existence of a second perpetrator precludes a determination that Prieto was the immediate perpetrator of the murders. The Commonwealth argues that there is only evidence of one person at the scene committing the rape and the murders; and,

42

therefore, because the DNA evidence implicates Prieto in the rape, the evidence is sufficient to support his conviction as the immediate perpetrator of the murders.

Prieto relies upon our decisions in Rogers v. Commonwealth, 242 Va. 307, 410 S.E.2d 621 (1991), and Cheng, to argue that there was insufficient evidence to establish him as the immediate perpetrator of the murders. In Rogers, the defendant admitted to the rape and robbery of the victim, but repeatedly denied knowing who stabbed her. Id. at 315, 410 S.E.2d at 626. The defendant stated in a police interview that Troy Malcolm told the defendant that he had stabbed the victim, and stated that he saw blood on Malcolm's jacket. Id. at 314, 410 S.E.2d at 625. Malcolm admitted to being present in the victim's home, where the crimes were committed. Id. at 316, 410 S.E.2d at 626. The defendant stated that he remained in the victim's home after Malcolm ran out the back door, and was confronted by two witnesses when he later exited the house. Id. We determined that the Commonwealth "tacitly conced[ed] that at least one other person was present at some point during this criminal enterprise," and held, therefore, that the evidence was insufficient to exclude Malcolm as a perpetrator. Id. at 318-19, 410 S.E.2d at 628. We reversed the defendant's capital murder conviction. Id. at 320, 410 S.E.2d at 629.

In *Cheng*, there were three known participants in the abduction, robbery, and murder of the victim. 240 Va. at 43, 393 S.E.2d at 608. The defendant and two co-conspirators were together during the two days prior to when the victim's body was discovered. *Id.* at 30-31, 393 S.E.2d at 601. The defendant told the co-conspirators that he was going to rob a restaurant and they went to a restaurant co-owned by the victim. *Id.* The next day, the defendant told the co-conspirators to "bring the shotgun and the jeep," and they stopped at the house of one of the co-conspirators and retrieved the shotgun and the defendant's jeep. *Id.* at 31, 393 S.E.2d at 601. The following morning, the victim's body was found with four gunshot wounds. *Id.* at 31-32, 393 S.E.2d at 602.

The defendant in *Cheng* told a police officer that "he didn't do it." *Id.* at 33, 393 S.E.2d at 603. The police officer testified that the defendant later told him that a man had put a contract on him and "they had to get rid of him," but that the defendant did not state directly that he was involved in the crimes. *Id.* at 43, 393 S.E.2d at 608. We held that the evidence, at most, created a strong suspicion that the defendant was the triggerman, and was therefore insufficient to support his conviction of capital murder. *Id.*

We have previously addressed the standard of review for a challenge, on appeal, of the sufficiency of the evidence supporting a jury verdict.

> We have held in many cases that, upon appellate review, the evidence and all reasonable inferences flowing therefrom must be viewed in the light most favorable to the prevailing party in the trial court. The judgment of the trial court is presumed to be correct and will be reversed only upon a showing that it is plainly wrong or without evidence to support it. The issue upon appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (internal quotation marks and citations omitted).

Unlike in Rogers and Cheng, in this case there was no conclusive evidence of the presence of another perpetrator. Rogers and Cheng are inapplicable due to the overwhelming evidence that Prieto was the sole perpetrator of the murders.

The field where Raver and Fulton's bodies were discovered in December 1988 was located at the 1800 block of Hunter Mill Road, which lies just south of the Dulles Toll Road in Fairfax County. Prieto was familiar with the area as prior to the time of the murders, he worked with a crew cutting grass and driving trucks along the Dulles Toll Road, near where the bodies were found. When the police thoroughly searched the

45

scene of the murders, there was no evidence discovered, other than potentially the lost hair evidence, that pointed to the existence of a second suspect.

Raver and Fulton were each killed by a single gunshot wound.  The bullets recovered from their bodies were fired from the same weapon.  The weapon was determined to be a revolver.  Prieto owned a revolver around the time of the murders.  There was no evidence of a second weapon involved in the murders or present at the scene of the murders.

The Commonwealth's theory of the murders was that Raver and Fulton were abducted and taken to the scene of the murders in Raver's car.  When Raver and Fulton drove in her car to Washington, D.C. the last night they were seen alive, the backseat of the car contained a large box filled with miscellaneous items.  There was only enough space for one additional person to sit in the backseat of the car.  It was fewer than 36 hours after Raver and Fulton were last seen alive when the car was observed in New York City.

Circumstantial evidence from the scene included Raver's body being found a short distance from where all her clothes except her bra, sweater, coat, and socks were located.  The evidence of scraping on her body and the presence of Prieto's semen in her vagina support the conclusion that she was raped

46

at the scene by Prieto, and there was no evidence of any other person's participation in the assault, rape, or murders.

The potentially exculpatory foreign hairs did not lessen the impact of the other evidence the jury heard at trial. The presence of the hairs could have been the result of transference. Evidence was presented by the Commonwealth that because of the transient nature of hair, there were, prior to the transfer, potential sources of the hair other than another perpetrator. The lost hairs could have been transferred as a result of Raver's use of a common washer and dryer in her apartment building or from her use of the toilet at the Washington, D.C. restaurant the last evening she was seen alive, or from Prieto or possibly even Fulton, as a carrier of the hairs and not the source. The fact that Raver was wearing new underpants on the night of the murders does not negate the possibility of such transference. From the standpoint of a forensic analysis, the hairs' significance in terms of exculpatory value was inconclusive at best, possibly even having the potential to inculpate Prieto if it was determined the lost hairs matched his known head hairs.

When viewed together, the evidence presented at trial, including the substantial circumstantial evidence, was sufficient to support Prieto's death sentence as an immediate perpetrator or principal in the first degree in the two

47

capital murder convictions. "Circumstantial evidence is not viewed in isolation. 'While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.' " Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (internal quotation marks omitted) (quoting Derr v. Commonwealth, 242 Va. 413, 425, 410 S.E.2d 662, 669 (1991)), cert. denied, 540 U.S. 972 (2003).

Based upon the overwhelming evidence that Prieto raped Raver at the time she was murdered and the circumstantial evidence that there was only one perpetrator involved in the murders, the evidence is sufficient to prove beyond a reasonable doubt that Prieto was the immediate perpetrator of the murders of Raver and Fulton. We hold that the circuit court correctly denied Prieto's motions to strike based on his argument that the evidence was insufficient to prove he was the immediate perpetrator and that he committed the crimes for which he was convicted.

## VII. VERDICT FORMS

We next consider whether the sentencing phase verdict forms provided to the jury in Prieto II were defective. Prieto makes two arguments. First, he argues the verdict forms were defective because the forms did not provide an

48

option for the jury to sentence Prieto to life imprisonment if the jury found one or both aggravating factors. Second, he contends the verdict forms did not require the jury to be unanimous in its finding regarding which of the aggravating factors it found beyond a reasonable doubt in support of its death penalty verdict. We address why the verdict forms were defective for both reasons.

### A. Sentencing Option of Life Imprisonment Even If One or Both Aggravating Factors Found

During the sentencing phase, the circuit court overruled Prieto's objection that the verdict forms should provide an option for the jury to sentence Prieto to life imprisonment even if the jury found one or both aggravating factors. The circuit court held that it had "an obligation to follow the language of [Code § 19.2-264.4(D)]," which provides sample verdict forms. The court also noted: "I don't have any question that the language in the statute is mandatory, I don't have any flexibility in that at all." The court recognized this as a "dilemma" because it held that the statutory verdict form was mandatory, but also that it was "lacking" if the jury finds "the aggravators but [does not] give death."

Verdict form two, used by the jury in its finding

concerning the murder of Raver, tracked the language of Code

§ 19.2-264.4(D) and provided:

> We, the jury on the issue joined, having found
> Alfredo Prieto guilty of the willful,
> deliberate and premeditated killing of Rachael
> Raver in the commission of or subsequent to
> rape and that after consideration of his prior
> history that there is a probability that he
> would commit criminal acts of violence that
> would constitute a continuing serious threat to
> society or his conduct in committing the
> offense is outrageously or wantonly vile,
> horrible or inhuman in that it involved torture
> or depravity of mind, and having considered the
> evidence in mitigation of the offense,
> unanimously fix his punishment at death.
>
>     Signed_____, foreman.
>
>   Or
>
> We, the jury on the issue joined, having found
> Alfredo Prieto guilty of the willful,
> deliberate and premeditated killing of Rachael
> Raver in the commission of or subsequent to
> rape and having considered all of the evidence
> in aggravation and mitigation of such offense,
> fix his punishment at:
> (please choose one)
>
> ___imprisonment for life
>
> or
>
> ___imprisonment for life and a fine of
> $_____.
>
>     Signed_____, foreman.

Verdict form three, used by the jury in its finding

concerning the murders of Raver and Fulton as part of the same

50

act or transaction was identical to verdict form two, except

for the names of the victims and the description of the

capital murder elements.

The court acknowledged Prieto's objection to the verdict

forms, stating:

> I mean couldn't someone read this verdict form
> to suggest that if the aggravating factors are
> present, death follows, and if the aggravating
> factors are not present, there must be
> imprisonment for life.  But it doesn't address
> the third possibility which is the aggravating
> factors exist but you choose life.

The circuit court granted three instructions that

addressed this issue.  Instructions 6A and 6B were offered by

the Commonwealth with respect to the capital murder of Raver

in the commission of or subsequent to rape and the capital

murder of Raver and Fulton as part of the same act or

transaction.  These two instructions were intended to properly

instruct the jury regarding the statutory aggravators of

future dangerousness and vileness, the Commonwealth's burden

of proof regarding those aggravating factors, the

consideration of evidence in mitigation, and the sentencing

options available to the jury.

In addition, the circuit court granted Instruction J,

which was offered by Prieto.  Instruction J provided:

> You are instructed that even if you find
> the Commonwealth has proven beyond a reasonable
> doubt one or both of the aggravating

51

circumstances, you are never required to sentence the defendant to death. Rather, despite your findings, you may if you choose sentence him to life in prison without the possibility of parole, with or without a fine.

In other words, with regard to either or both Verdict Forms Number 2 and 3, if you find the Commonwealth has proven beyond a reasonable doubt one or both of the aggravating circumstances, and you find that the appropriate sentence is death, you would use the first paragraph on Verdict Form Number 2 and Verdict Form Number 3, respectively.

Alternatively, there are two circumstances in which you would use the second paragraph on Verdict Form Number 2 and Verdict Form Number 3: (1) if you find that the Commonwealth has proven beyond a reasonable doubt one or both of the aggravating circumstances and you nevertheless find that the appropriate sentence is life or life and a fine; or (2) if you find that the Commonwealth has failed to prove beyond a reasonable doubt at least one of the aggravating circumstances.

The foreman of the jury endorsed the first paragraph of verdict forms two and three, thus sentencing Prieto to death on each charge. After Prieto was convicted and sentenced to death, he filed a motion to set aside his death sentences and for a new trial arguing that the verdict forms failed to provide the jury with the option of imposing a life sentence even if it found one or both of the aggravating factors. In his motion, Prieto provided the court with case law supporting his argument. Specifically, Prieto argued that this court's decisions in Powell v. Commonwealth, 261 Va. 512, 552 S.E.2d

344 (2001), and Morrisette v. Warden of the Sussex I State Prison, 270 Va. 188, 613 S.E.2d 551 (2005), cert. denied, 546 U.S. 1216 (2006), controlled the issue and required the circuit court to provide a verdict form that gave the jury the option of sentencing Prieto to life even if it found one or both of the aggravating factors.

At oral argument on Prieto's motion, the circuit court stated that what it characterized as a dilemma in the jury instruction conference was not in fact a dilemma at all because this Court in Powell and Morrisette held that the circuit court "must explicitly provide a verdict form containing the option of life in prison even where the jury finds one or both [aggravating] factors to exist." The court also stated: "Had I had Morrisette and Powell in front of me when I decided this issue, I assure you that the verdict form would have been modified in a manner consistent with these binding precedents."

The court, in discussing Prieto's verdict forms in light of Powell and Morrisette, noted that "the Supreme Court could not have been more explicit and this verdict form does not square with its decision." Nevertheless, the court denied Prieto's motion, holding that Instruction J goes substantially beyond the standard instruction which tells the jury that it can find an aggravating factor to exist and still impose a

sentence of life.  According to the court, Instruction J distinguishes this case from Morrisette and Powell.  The court stated that with the instruction, "the jury could not have been confused or conflicted about its options."

On appeal to this Court, Prieto argues that verdict forms two and three were defective because they failed to give the jury the option of imposing a life sentence even if it found one or both aggravating factors, as required by Powell and Morrisette.  Prieto contends that the jury instructions did not correct this defect because a jury instruction, no matter how clear, cannot cure a problem with a defective verdict form.

In response, the Commonwealth argues that this Court has never held that Virginia's statutory verdict form contained in Code § 19.2-264.4(D) is constitutionally lacking.  The Commonwealth asserts that the verdict forms used correspond exactly to the jury instructions and provided a means for the jury to exercise each sentencing option.  According to the Commonwealth, this Court's discussion of verdict forms in Powell is dicta and was rendered as an advisory opinion for future capital cases.  Additionally, the Commonwealth contends that in Morrisette the Court did not rule that the circuit court erred in using the statutory verdict form because it was a habeas case addressing ineffective assistance of counsel.

54

The Commonwealth also asserts that because the General Assembly amended Code § 19.2-264.4 after Powell, it abrogated Powell as far as requiring verdict forms to provide for the sentencing option Prieto now urges.  The Commonwealth maintains that because of the General Assembly's action, courts are required to use the statutory verdict form.

On this issue, we agree with Prieto.  We have previously held that "it is materially vital to the defendant in a criminal case that the jury have a proper verdict form." Atkins v. Commonwealth, 257 Va. 160, 178, 510 S.E.2d 445, 456 (1999).[5]  In Powell, we addressed whether in a capital murder sentencing, a circuit court commits error by failing to grant a proposed verdict form which provides the jury the option to impose a sentence of life imprisonment even if the jury finds both aggravating factors.  See 261 Va. at 542, 552 S.E.2d at 361.

While reversing Powell's conviction on other grounds, we recognized that this was an issue of first impression and addressed the issue on the merits, stating that our decision "will be instructive to future capital murder trials."  Id. at 541, 552 S.E.2d at 361.  We stated:

---

[5] For a recent summary of the subsequent proceedings and history of Atkins, see In re Commonwealth, 278 Va. 1, 5-8, 677 S.E.2d 236, 237-38 (2009).

[T]he issue [in this case] is whether the jury
is likely to be confused where it is instructed
that it may impose a sentence other than death
if it finds one or both of the aggravating
factors have been proven beyond a reasonable
doubt, but receives verdict forms that do not
expressly state that the jury is allowed to fix
a sentence of life imprisonment even though one
or both aggravating factors are present.

The rationale of Atkins flows from the
principle that "it is materially vital to the
defendant in a criminal case that the jury have
a proper verdict form." Atkins, 257 Va. at 178,
510 S.E.2d at 456. That rationale may be
extended to the provision of jury verdict forms
with sentencing options that accurately and
expressly correspond to the trial court's
sentencing instruction. *Accordingly, we hold
that in a capital murder trial, the trial court
must give the jury verdict forms providing
expressly for the imposition of a sentence of
imprisonment for life and a fine of not more
than $100,000 when the jury finds that one or
both of the aggravating factors have been
proven beyond a reasonable doubt.*

Id. at 545, 552 S.E.2d at 363 (emphasis added).

Subsequent to Powell, we considered the same issue in the

context of a writ of habeas corpus in which the defendant

claimed that his trial counsel was ineffective for not

objecting to the verdict forms, which did not give the jury

the option of imposing a life sentence if it found one or both

of the aggravating factors.  Morrisette, 270 Va. at 197, 613

S.E.2d at 559.  In addressing the merits of the defendant's

ineffective assistance claim, we stated:  "We take this

opportunity to reaffirm our holding in Powell," that a verdict

56

form must expressly include that sentencing option.  Id. at 202, 613 S.E.2d at 562.

Our decisions in Powell and Morrisette make it clear that a verdict form must provide the jury with the explicit option of imposing a life sentence even if the jury finds one or both aggravating factors.  The Commonwealth's argument that any error in the verdict form is cured by the jury instructions is without merit.  As in this case, we have previously set aside a defendant's sentence of death and ordered a new sentencing proceeding because "[t]he jury was presented with a confusing situation in which the trial court's instructions and the form the jury was given to use in discharging its obligations were in conflict."  Atkins, 257 Va. at 179, 510 S.E.2d at 457.  No jury instruction can overcome a verdict form in a capital murder sentencing proceeding which is defective for lack of a sentencing option to impose life imprisonment even if one or both aggravators are found.

We also disagree with the Commonwealth's argument that the General Assembly's amendment of Code § 19.2-264.4 after our decision in Powell was a rejection of the holding in Powell.  Code § 19.2-264.4 establishes the sentencing proceeding in a capital murder case and recognizes that a jury must be instructed upon request of the defendant that a life sentence means life without parole.  This statute also

authorizes victim impact testimony and addresses the admissibility of evidence in sentencing proceedings. Moreover, the statute stipulates that no penalty of death can be imposed unless the Commonwealth proves one or both aggravating factors beyond a reasonable doubt and requires the imposition of imprisonment for life if a sentencing jury cannot agree as to the penalty.

There is, however, nothing in Code § 19.2-264.4 dictating required jury instructions. It is the interplay between a circuit court's instructions to the jury and an appropriate sentencing verdict form that is central to the issue in this case. Code § 19.2-264.4(D) states that "[t]he verdict of the jury shall be in writing, and in one of the following forms" and provides only two forms. Clearly, the two generic forms cannot be intended to limit the circuit court in the myriad of possible instructions and verdict forms that may arise in a capital murder case.

Our review of trial records in previous capital murder cases involving imposition of the sentence of death reveals that the statutory form was often not utilized, yielding to the circuit court's discretion in tailoring verdict forms to the issues presented in a particular case. In these cases, the circuit courts provided multiple verdict forms offering the jury the option of finding unanimously and beyond a

reasonable doubt either or both aggravating factors, and offering the jury for each finding the option of death or life imprisonment, with or without a fine.  Porter v. Commonwealth, 276 Va. 203, 264-65, 661 S.E.2d 415, 447-48 (2008); Gray v. Commonwealth, 274 Va. 290, 645 S.E.2d 448 (2007); Teleguz v. Commonwealth, 273 Va. 458, 643 S.E.2d 708 (2007), cert. denied, ___ U.S. ___, 128 S.Ct. 1228 (2008); Juniper v. Commonwealth, 271 Va. 362, 388, 626 S.E.2d 383, 400-01, cert. denied, 549 U.S. 960 (2006); Muhammad v. Commonwealth, 269 Va. 451, 526, 619 S.E.2d 16, 59 (2005), cert. denied, 547 U.S. 1136 (2006).

We hold that the language of Code § 19.2-264.4 does not require the circuit court to abdicate its authority in tailoring jury instructions and verdict forms so that a jury is clearly instructed on the issues relevant to the particular case the jury is considering.

Sentencing options set forth in a verdict form must explicitly correspond to the circuit court's sentencing instructions.  Morrisette, 270 Va. at 202, 613 S.E.2d at 562. Since Code § 19.2-264.4 provides no requirements or guidance for the circuit court in instructing a capital sentencing jury, there is no way that the verdict forms set out in Code § 19.2-264.4(D) could adequately apply to all possible sentencing alternatives available to the jury.  Although the

jury was instructed that in finding one or both of the aggravating factors, the jury could sentence Prieto to life imprisonment, with or without a fine, there simply was no corresponding option in the statutory verdict form.

We find no reason to depart from our previous holding in Powell and Morrisette that when a jury is instructed that available sentencing options include life imprisonment, with or without a fine, the circuit court is required to provide a verdict form expressly providing the jury with that option. In this case, the verdict forms provided by the circuit court were defective in not specifically providing the jury in the sentencing phase the option to sentence Prieto to life imprisonment, with or without a fine, even if the jury found one or both of the aggravating factors.

B.   Unanimity Regarding Aggravating Factors

The circuit court also denied Prieto's request for a sentencing verdict form that informed the jury that it had to be unanimous in the finding of one or both of the aggravating factors.  Verdict forms two and three utilized by the jury in its findings, provided, in pertinent part:

> [A]fter consideration of [the defendant's]
> prior history . . . there is a probability that
> he would commit criminal acts of violence that
> would constitute a continuing serious threat to
> society or his conduct in committing the
> offense is outrageously or wantonly vile,
> horrible or inhuman in that it involved torture

or depravity of mind, and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

(Emphasis added).

Specifically, Prieto argued that the two aggravating factors are elements of the offense that must be found beyond a reasonable doubt by a unanimous jury, pursuant to Ring v. Arizona, 536 U.S. 584 (2002). Prieto's proposed verdict form, which was not granted by the circuit court, included the phrase "unanimously and beyond a reasonable doubt" in the finding of each aggravator.[6] Prieto also raised this issue

---

[6] Prieto's proposed verdict form reads as follows:

We, the jury, on the issue joined, having found the defendant guilty of the capital murder of Rachael Raver in the commission of or subsequent to rape and:

(1) having found unanimously and beyond a reasonable doubt, after consideration of his history and background that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society,
**(enter "found" or "not found")_____**

**and/or**

(2) having found unanimously and beyond a reasonable doubt that his conduct in committing the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder,
**(enter "found or "not found")_____**

**and**

61

post-trial in a motion to set aside the death sentences and for a new trial, which the circuit court denied.

On appeal, Prieto argues that the verdict forms were defective under <u>Ring</u> because they did not require the jury to unanimously find at least one of the aggravating factors to impose a death sentence. Prieto contends that the aggravating factors are elements of the offense because they are facts that increase the maximum punishment from life imprisonment to death. According to Prieto, it is not clear from the verdict

---

having considered all the evidence in mitigation of the offense, unanimously fix his punishment at:
Choose one:
\_\_\_\_\_**Death (you may choose this option only if you have found one or both of the aggravating circumstances); or**
\_\_\_\_\_**Imprisonment for life (you may choose this option even if you have found one or both of the aggravating circumstances); or**
\_\_\_\_\_**Imprisonment for life and a fine of $_____(fine must not be more than $100,000)(you may choose this option even if you have found one or both aggravating circumstances).**

Signed_____,
Foreman

Another section of Prieto's proposed verdict form concerning the murders of Raver and Fulton as part of the same act or transaction contained the same language as above, except for the names of the victims and the description of the capital murder elements.

forms whether the jury unanimously found either or both of the aggravating factors as required by Ring.

The Commonwealth responds that neither of the aggravating factors is an element, but rather, they are alternate means of proof. The Commonwealth argues that Code § 19.2-264.4 only requires that the vote for imposing a death sentence be unanimous. The Commonwealth asserts that our decisions in Clark v. Commonwealth, 220 Va. 201, 257 S.E.2d 784 (1979), cert. denied, 444 U.S. 1049 (1980), and Hoke v. Commonwealth, 237 Va. 303, 377 S.E.2d 595, cert. denied, 491 U.S. 910 (1989), support its position that the jury need not make a unanimous finding regarding individual aggravating factors. We disagree with the Commonwealth on this issue.

"[T]he death penalty may not be imposed unless the trier of fact finds one or both of the two aggravating factors that we have referred to as 'vileness' and 'future dangerousness.' " Schmitt v. Commonwealth, 262 Va. 127, 149, 547 S.E.2d 186, 201 (2001), cert. denied, 534 U.S. 1094 (2002). The issue in this case is whether the two aggravating factors are elements of capital murder that must be found unanimously and beyond a reasonable doubt.

Code § 19.2-264.4(C) provides:

> The penalty of death shall not be imposed
> unless the Commonwealth shall prove beyond a
> reasonable doubt that there is a probability

based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

Likewise, Code § 19.2-264.2 provides:

In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.

The Supreme Court of the United States has held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). In Apprendi, the Supreme Court addressed "whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20

64

years be made by a jury on the basis of proof beyond a reasonable doubt." Id. at 469. The factual determination at issue in Apprendi was addressed in the context of the constitutionality of a New Jersey statute that provided for an extended term of imprisonment "if the trial judge finds, by a preponderance of the evidence, that the defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." Id. at 468-69 (internal quotation and citation omitted).

The decision in Apprendi was expounded upon two years later, in Ring, when the Supreme Court of the United States held that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 588. In Ring, the Supreme Court addressed the constitutionality of Arizona's death penalty scheme, which allowed the trial judge, sitting alone and after a jury adjudication of a defendant's guilt, to determine the presence or absence of aggravating factors that allow imposition of the death penalty. The Court held that this scheme was unconstitutional, stating: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a

65

reasonable doubt." Id. at 602. Justice Scalia, concurring, noted:

> [T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

Id. at 610.

Thus, our inquiry must focus on whether the aggravating factors in Virginia's death penalty statute are facts that increase the maximum punishment for a defendant. Clearly, they are. The death penalty may not be imposed unless the jury finds either or both of the aggravating factors of "vileness" or "future dangerousness" beyond a reasonable doubt. Code §§ 19.2-264.2, -264.4. As such, the aggravating factors must be submitted to a jury and found beyond a reasonable doubt. Moreover, because this Court has recognized that there are two distinct aggravating factors, one or both of the aggravating factors must be found beyond a reasonable doubt by a jury before a death sentence may be imposed. Furthermore, Article I, § 8 of the Constitution of Virginia provides that a jury's verdict in a criminal case must be unanimous.

The Commonwealth's reliance on Clark v. Commonwealth is misplaced. In Clark, the defendant argued that the verdict

66

form "authorized the jury to impose a penalty of death if it found the defendant's conduct involved depravity of mind *or* aggravated battery to the victim," which is a challenge that the form should reflect unanimity regarding which sub-factor of the "vileness" aggravating factor on which the jury based its verdict, not whether unanimity was required for the "vileness" factor.  220 Va. at 213, 257 S.E.2d at 791.  We rejected the defendant's argument, holding that the "verdict returned by the jury complie[d] with the language of the statute."  Id.  Thus, Clark stands only for the proposition that the jury's finding regarding the various sub-factors of the "vileness" aggravating factor need not be unanimous. Clark was decided prior to Apprendi and Ring, and we did not address whether the jury's verdict regarding the two aggravating factors of "future dangerousness" or "vileness" must be unanimous.

The Commonwealth's reliance on Hoke v. Commonwealth is also misplaced.  In Hoke, the defendant argued that his constitutional right to a unanimous verdict was violated because a jury instruction, to which he did not object, "was ambiguous and vague and therefore violated [his] constitutional rights to a unanimous verdict."  237 Va. at 315, 377 S.E.2d at 602 (internal quotation marks omitted).  He argued that the instruction did not delineate between the

67

"vileness" and "future dangerousness" aggravating factors. Id. However, the defendant conceded that the death sentence was unanimous. Id. Moreover, the circuit court polled the jury, and each juror affirmed that his or her verdict was based on both aggravating factors. Id. Because there was an independent basis to affirm the jury's finding regarding both aggravating factors, and because the defendant conceded that the verdict was unanimous, we did not address the merits of the defendant's unanimity argument.

Unlike Prieto's proffered verdict form, there is no language in verdict forms two and three requiring the jury to find one or both aggravating factors "unanimously and beyond a reasonable doubt." In this case, it is impossible to discern from the verdict forms whether the jury unanimously found either or both aggravating factors beyond a reasonable doubt. This presents the troubling possibility that six or more of the jurors based their decision on the "future dangerousness" factor, while the other six or fewer based their decision on the "vileness" factor. This hypothetical result, which is permissible according to the language in the verdict forms, would result in the jury sentencing Prieto to death based on a non-unanimous verdict in violation of the Virginia Constitution.

Therefore, we hold that in the penalty phase of capital murder trials the death penalty may not be imposed unless the jury unanimously finds either one or both of the aggravating factors of "vileness" or "future dangerousness" beyond a reasonable doubt.  We further hold that the verdict form in Prieto II is defective in failing to explicitly set out the unanimity required in the jury finding of one or both of the aggravating factors beyond a reasonable doubt.

Based upon the insufficiency of the verdict forms to provide the jury the specific option to impose a life sentence even if the jury finds both aggravating factors proven, and based upon the insufficiency of the verdict forms to require the jury to unanimously find beyond a reasonable doubt one or both aggravating factors to impose a sentence of death, we will set aside the death sentences imposed by the jury and remand this case to the circuit court for a new sentencing proceeding.

VIII. RECORD OF CONVICTION WITH DEATH SENTENCE DISPLAYED

Because we have remanded this case for resentencing, in order to provide guidance to the circuit court, it is necessary that we address Prieto's objection to the introduction of the record of his capital murder conviction from California which contained information that he was sentenced to death for the California murder.

Prior to the start of the sentencing phase, Prieto objected to the inclusion of information regarding his death sentence in California, which was displayed in his criminal record that the Commonwealth sought to submit to the jury. The circuit court overruled Prieto's objection and admitted the documents into evidence.

Prieto argues that the admission of his previous death sentence was irrelevant to his "future dangerousness" and undermined the jury's obligation to consider the mitigating evidence. Prieto contends that informing the jury that a defendant has already been sentenced to death also undermines the fairness of the penalty proceeding.

The Commonwealth responds that this issue has been decided by this Court in Bassett v. Commonwealth, 222 Va. 844, 284 S.E.2d 844 (1981), cert. denied, 456 U.S. 938 (1982), and thus the circuit court's admission of Prieto's criminal record was proper. The Commonwealth argues it is speculation that knowledge of an already existing death penalty might trivialize the jury's decision, so that the jury might impose a death sentence with less deliberation if it knows that the defendant has already been sentenced to death.

We agree with the Commonwealth's arguments on this issue. Code § 19.2-264.4(B), which addresses the scope of admissible

evidence in the sentencing phase of a capital murder trial,

provides, in pertinent part:

> In cases of trial by jury, evidence may be presented as to any matter which the court deems relevant to sentence, except that reports under the provisions of § 19.2-299, or under any rule of court, shall not be admitted into evidence.
>
> Evidence which may be admissible, subject to the rules of evidence governing admissibility, may include the circumstances surrounding the offense, the history and background of the defendant, and any other facts in mitigation of the offense.

Additionally, Code § 19.2-295.1 provides that upon a finding

that a defendant is guilty of a felony, the Commonwealth

"shall present the defendant's prior criminal history,

including prior convictions and the punishments imposed, by

certified, attested or exemplified copies of the final order,

including adult convictions."

In Bassett, we addressed whether the circuit court

properly admitted the defendant's prior sentence and

conviction for armed robbery during the penalty phase of his

capital murder trial.  222 Va. at 858, 284 S.E.2d at 853.  We

held that the evidence was admissible, noting that "[t]he

sentence reflects the gravity of the offense and the

offender's propensity for violence."  Id.  While the sentence

in Bassett was not a death sentence, the same rationale

applies to allowing the circuit court to admit a defendant's

prior conviction that includes a death sentence to establish the aggravating factor of the defendant's future dangerousness.

We also agree with the Commonwealth that it is entirely speculative whether knowledge of an existing sentence of death would make a jury more or less likely to impose a second death sentence. We believe that Virginia jurors will be able to follow the instructions of the court and to render a verdict according to the dictates of their individual consciences. Accordingly, the circuit court did not err in admitting Prieto's criminal record which included his death sentence in California.

IX. SENTENCING ISSUES PREVIOUSLY DECIDED

Prieto's assignments of error also include arguments this Court has previously rejected. Finding no reason to modify or revisit our position on these issues, we adhere to our prior holdings and reject the following arguments.

A. Constitutionality of Virginia's Death Penalty Statutes

In assignment of error 15, Prieto challenges the constitutionality of the death penalty statutes in Virginia.

1. Prieto contends that the statutes fail to adequately direct the jury on how to evaluate the aggravating factors of "vileness" or "future dangerousness" or the mitigating factors so as to prevent the arbitrary and capricious imposition of

the death penalty.  This argument was rejected in <u>Juniper</u>, 271 Va. at 388, 626 S.E.2d at 401 (aggravating factors and mitigating evidence); <u>Wolfe v. Commonwealth</u>, 265 Va. 193, 208, 576 S.E.2d 471, 480, <u>cert.</u> <u>denied</u>, 540 U.S. 1019 (2003) (aggravating factors); and <u>Watkins v. Commonwealth</u>, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), <u>cert.</u> <u>denied</u>, 475 U.S. 1099 (1986) (mitigating evidence).

2. Prieto also argues that unajudicated criminal acts should not be considered in order to find future dangerousness.  We rejected this argument in <u>Juniper</u>, 271 Va. at 389, 626 S.E.2d at 401, and <u>Stockton v. Commonwealth</u>, 241 Va. 192, 209-10, 402 S.E.2d 196, 206, <u>cert.</u> <u>denied</u>, 502 U.S. 902 (1991).

3. Prieto further contends that hearsay in the post-sentence report should not be considered, which is an argument we rejected in <u>Teleguz</u>, 273 Va. at 474, 643 S.E.2d at 719, and <u>O'Dell v. Commonwealth</u>, 234 Va. 672, 701-02, 364 S.E.2d 491, 507-08, <u>cert.</u> <u>denied</u>, 488 U.S. 871 (1988).

4. Prieto contests the inability to set aside the sentence of death upon a showing of good cause.  We rejected the same argument in <u>Juniper</u>, 271 Va. at 389, 626 S.E.2d at 401, <u>Teleguz</u>, 273 Va. at 474, 643 S.E.2d at 719, and <u>Breard v. Commonwealth</u>, 248 Va. 68, 76, 445 S.E.2d 670, 675-76, <u>cert.</u> <u>denied</u>, 513 U.S. 971 (1994).

5. Prieto argues that the proportionality and passion/prejudice review conducted by this Court are not consistent with the Eighth Amendment and other federal or state constitutional provisions.  We rejected this argument in Teleguz, 273 Va. at 475, 643 S.E.2d at 719, Satcher v. Commonwealth, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), cert. denied, 507 U.S. 993 (1993), and Smith, 239 Va. at 253, 389 S.E.2d at 876.

B.    "Future Dangerousness" and "Vileness" Instructions

In assignments of error 67 and 68, Prieto argues that the circuit court erred when it refused to give the jury his proposed instructions H and K.  For the "future dangerousness" aggravating factor, instruction H would have, in part, defined the term "probability" to mean "a reasonable likelihood that the defendant will actually commit intentional acts of unprovoked violence in the future."  For the "vileness" aggravating factor, instruction K would have, in part, defined the term "depravity of mind" to mean "a degree of moral turpitude and debasement surpassing that inherent in the definition of ordinary malice and premeditation."

Because these definitions come from this Court's decision in Smith v. Commonwealth, 219 Va. 455, 478, 248 S.E.2d 135, 149 (1978), cert. denied, 441 U.S. 967 (1979), Prieto contends they became part of the law in Virginia and have narrowed the

74

meaning of the aggravating factors so as to make them an element of the offense. Prieto asserts that under Ring v. Arizona, 536 U.S. 584 (2002), and Bell v. Cone, 543 U.S. 447, 454 n.6 (2005), the proposed instructions should have been given in order to ensure that the jury properly determined whether Prieto was a future danger to society or his conduct was sufficiently vile in order to support a sentence of death.

We have specifically rejected the argument Prieto raises with regard to the future dangerousness aggravating factor involved in proposed instruction H. Porter v. Commonwealth, 276 Va. 203, 264-65, 661 S.E.2d 415, 447-48 (2008), cert. denied, ___ U.S. ___, 129 S.Ct. 1999 (2009). We see no reason to readdress this ruling at this time.

The circuit court also did not err in refusing to give proposed instruction K. We have rejected the notion that the term "depravity of mind" is unconstitutionally vague, Sheppard v. Commonwealth, 250 Va. 379, 394, 464 S.E.2d 131, 140 (1995), cert. denied, 517 U.S. 1110 (1996), or that an instruction defining "depravity of mind" needs to be given. Tuggle v. Commonwealth, 228 Va. 493, 515, 323 S.E.2d 539, 553 (1984), vacated on other grounds, 471 U.S. 1096 (1985). We have also found that Virginia's death penalty statutes do not suffer from the same issues found in Ring, 536 U.S. at 592-93, and Muhammad, 269 Va. at 491, 619 S.E.2d at 39, and that Apprendi

v. New Jersey, 530 U.S. 466 (2000), does not require the jury to be instructed on the definitions of the subparts of the vileness aggravating factor.  Elliott v. Warden, 274 Va. 598, 627, 652 S.E.2d 465, 488-89 (2007).  Therefore, no additional instruction was needed in order for the jury to understand the vileness aggravating factor.

## X. PAGE LIMIT

In his opening brief, Prieto argues that this Court erred in denying his motion for an extension of page limit.  Prieto contends that this Court's denial of his motion impeded his right to effective assistance of counsel on appeal.

The Commonwealth responds that this argument is not a proper issue for appeal because it does not challenge a ruling made by the circuit court below.  The Commonwealth also contends this argument should be barred because no error was assigned.

We will not consider this argument on appeal because Prieto did not assign error to it and it is not an argument on which he can rely "for reversal of the conviction or review of the sentence of death."  Rule 5:22.

## XI. STATUTORY REVIEW OF DEATH PENALTY

Because we have determined that there was reversible error in the sentencing phase of Prieto's trial which will necessitate a remand to the circuit court, we need not

consider at this time "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17.1-313.

## XII. CONCLUSION

For the reasons stated, we find no reversible error in the guilt phase of Prieto's trial, and, accordingly we will affirm Prieto's convictions on all charges including the capital murder charges. Because there was error in the penalty phase, we will reverse the two sentences of death and remand the case to the circuit court for a new penalty proceeding on the capital murder convictions.

Reversed in part,
affirmed in part,
and remanded.

77