ROCKY DALE ROGERS

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 910479 and 910480

November 8, 1991

Present: All the Justices

*Ronald W. Vaught; Anthony F. Anderson (Melissa W. Friedman; Parks & Vaught*, on brief), for appellant.

*Oliver L. Norrell, III, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

On January 9, 1990, Dorothy H. Balsey, a 74-year-old widow, was brutally attacked in her home in the City of Covington. The victim died the next day from stab wounds to her chest and back combined with "blunt force" injuries to her head sustained during the attack.

Within a month, appellant Rocky Dale Rogers, age 24, was arrested. Subsequently, he was indicted for the following crimes arising from the attack: statutory burglary, Code § 18.2-90; robbery, Code § 18.2-58; and rape, Code § 18.2-61. In addition, the defendant was indicted for capital murder. The grand jury charged defendant with the willful, deliberate, and premeditated killing of the victim while in the commission of robbery when armed with a deadly weapon, or while in the commission of, or subsequent to, rape. Code § 18.2-31(4)(5).

Following several pretrial hearings, including a hearing on defendant's motion to suppress certain statements made to the police, he was tried on all the charges by a single jury in November 1990. The jury fixed the following punishments for the noncapital offenses: life imprisonment for rape; 50 years imprisonment for robbery; and 20 years imprisonment for statutory burglary. The jury also found defendant guilty of capital murder as charged in the indictment. During the second phase of the bifurcated capital proceeding, the jury fixed defendant's punishment at death based upon the vileness and future dangerousness predicates of the capital murder sentencing statute. Code § 19.2-264.4. Subsequently, the trial court considered a probation officer's report and, after a hearing in December 1990, sentenced defendant to death for the capital murder.

The death sentence is before us for automatic review under Code § 17-110.1(A), see Rule 5:22, and we have consolidated this review with defendant's appeal of the capital murder conviction. Code § 17-110.1(F). In addition, by order entered in March 1991, we have certified the appeals of the noncapital convictions from the Court of Appeals; the effect of the certification is to transfer jurisdiction over the noncapital appeals to this Court for all purposes. Code § 17-116.06(A). We have consolidated those appeals (Record No. 910480) with the capital murder appeal (Record No. 910479).

The defendant did not brief or argue orally the assignments of error attacking the noncapital convictions. Additionally, the defendant on brief does not request us to reverse those convictions.

Therefore, we will make no further specific reference to the validity of those convictions, and they will be affirmed.

■ The dispositive question in the capital murder appeal is whether the evidence is legally sufficient to establish that the defendant was the actual perpetrator of the crime. In summarizing the evidence, we will follow established principles and view the evidence and all reasonable inferences fairly deducible from the evidence in the light most favorable to the Commonwealth. *Cheng v. Commonwealth*, 240 Va. 26, 42, 393 S.E.2d 599, 608 (1990).

On the day of the attack, about 2:00 p.m., Lucille Byrd visited the victim at the victim's home, 314 East Prospect Street, to deliver a belated Christmas present. Byrd stayed with the victim until about 4:00 p.m. and left the present, a card with a $20 bill enclosed.

About 5:15 p.m. on that day, Robbie Balsey Entsminger, the victim's daughter, visited her mother, who lived alone, to "check up" on her because the victim had suffered a "stroke" about 18 months earlier. She was "on her way to recovery" from the stroke and could speak but not write. The daughter left the home about 6:15 p.m.

Between 6:30 p.m. and 6:45 p.m. on that day, Robert Edward Bolden observed the defendant in the 300 block of East Prospect Street when the witness was about "a house away" from the victim's residence. Bolden left a house in that block and, when he entered his automobile parked at the curb, found his left turn signal was inoperable. As Bolden "got out of the car and started messing with a bulb in the front, [he] looked down the street and [defendant] was in front of [the victim's] house and was walking towards" the witness, with a "medium stride" not walking "real fast." Defendant was coming "up" the sidewalk toward the witness and, when the two were six feet apart, Bolden recognized the defendant because the witness' nephew previously "had some trouble" with defendant. Bolden noticed that Rogers was not clean shaven and was missing front teeth. Bolden returned momentarily to the home he had just left. When he returned to his car, defendant had "disappeared." Bolden "pulled out" of the parking space at 6:50 p.m.

About 6:40 p.m. on the day in question, Mrs. Garnet Bryan was watching a news program on television in her residence at 316 East Prospect Street. She and the victim lived in the same two-story duplex house. The respective residences were separated by a

party wall. At that time, the witness heard the victim "hit the floor." The sound came from the victim's dining room, according to the witness. Assuming the victim had fallen, as was often the case immediately after the victim experienced the stroke, Bryan went to the front door of the victim's residence to render assistance. She had a key to the door but was unable to enter because an outside storm door was locked. The witness said, "I pounded on the door to let her know I knew she had fallen."

Bryan returned to her home and called the victim on the telephone, allowing it to ring three times. Receiving no answer, Bryan called the Selman residence at 312 East Prospect Street, "on the other side" of the victim's home. Mr. Selman was not at home but Mrs. Selman offered to go with Bryan to assist the victim.

Bryan and Selman met on the sidewalk and proceeded beside the victim's house to her back porch, which was on the Selman side of the home, to gain entry. As they entered the screened porch, the exterior door was standing open. They "went on up on the porch and the kitchen door was open, and went on in, the light was on in the kitchen and [they] knew there was something wrong then," because the night "was awful cold."

As Bryan entered the kitchen, followed closely by Selman, Bryan was struck on the shoulder by an individual that both women later identified as the defendant. Defendant was coming from the victim's dining room "fastening up his jacket as he was coming out." According to Bryan, defendant said, "you just step right on out of here. She's been taken care of, and she's going to be all right, and she don't need you." According to Bryan, she replied, "Well, I'll just see for myself" and she "pushed past" the defendant. Then, she said, "he took out and ran off the back porch and was gone."

The women found the victim lying face down in the dining room "perfectly nude" with her clothing beside her "full of blood." Her shirt had been "pushed up on her body" and there was a "knife sticking out of her back." The knife was one of a set of steak knives with white plastic handles from the victim's kitchen drawer.

After observing the victim, Selman "turned back around and went back to the back door." She said, "that's when I heard running, and I assumed that he had just, you know, run on away." When asked the direction the defendant was running, she said, "It

sounded like going out back [toward the alley] because it was cold outside and I could hear crunching of the ground."

Returning to the dining room, Selman assisted Bryan in trying to care for the victim. She "started to groan" and the women covered her with a quilt because "cold air was coming in that back door." Using the telephone in the dining room, they called the local rescue squad first and then the local police. The first policeman to arrive at the scene received the call at 6:45 p.m.

After the police were called, Mr. Selman came to the front door of the victim's residence. In order to allow him to enter, Mrs. Selman not only had to unlock both front doors but had to pull a front-hall "runner" rug back from against the inside door because it had been "pushed clean against" the door, blocking it.

The floor plan of the first floor of the home shows a hallway extending from the front door to the rear to the kitchen door. Steps to the second floor run from the front door parallel to the hallway. Adjacent to the hallway on the front is a living room. The dining room joins the living room to the rear and extends from the party wall across the whole width of the home past the kitchen door. A small pantry is off the kitchen at the very rear of the home adjacent to the back porch. The pantry has one door which leads to the kitchen.

Bryan testified that she saw no one but the defendant in the house or outside the house and that defendant "was by himself." Mrs. Selman stated that from the time they confronted defendant in the kitchen when he "ran out," they detected no one else in the house. She said she did not "see anyone else stirring, hear any other noises, anything like that."

The police and rescue squad personnel arrived at the scene at the same time, before 7:02 p.m. The victim was alive, lying against a buffet in the dining room near the door to the kitchen. The knife "was bent up so it was imbedded in her back . . . above her bra strap." One of the paramedics cut bandages "and secured the knife in place where it was at." The victim was semi-conscious and was able to talk but she "wasn't saying anything relevant." She was lying on her stomach in a pool of blood which apparently was coming from head wounds. When she was moved, "a glass candlestick holder" which "had some blood on it" was uncovered.

The victim's daughter arrived at the scene shortly after 7:00 p.m., having been called by Bryan. In order to collect her mother's personal effects, she went upstairs to her mother's bedroom. A

light and a television set were "on" in the bedroom. In plain view on a dresser were two diamond rings and a watch. The victim's wallet was inside a shoulder bag hanging in the bedroom closet. The wallet contained credit cards and about $70 in cash. None of the furnishings or items in the bedroom had been disturbed and there was no indication "there had been any type of rummaging around." All of the upstairs windows were closed.

The $20 bill left as a Christmas gift was not found by the daughter or by anyone else at the scene. Upon arrival at the scene, however, the police observed four $1 bills lying in plain view in a dish on a table in the downstairs hallway.

The victim was transported to the emergency room of a local hospital. The emergency room physician found the knife inserted in her back about two inches beneath the skin, and removed it. The physician observed two other wounds about the width of the knife's blade on the victim's back near the site where the knife was imbedded. The knife was sticking into bare skin, not through any clothing. The victim was blue about the head and neck "because she had been severely beaten around her head, particularly her ears."

On January 11, the day following the victim's death, Dr. David W. Oxley, a state medical examiner, performed an autopsy on the decedent. The examiner found that the victim had sustained a fracture of the jawbone, fracture of the right orbital rim ("the bony part of the eye socket"), fracture of the nose, bruises inside her lips, and contusion of the throat. The examiner opined that the latter injury was consistent with an aborted attempt at strangulation and that all the other injuries were caused by "blunt force, blows" from a fist or the candleholder.

The examiner also found a stab wound to the chest which passed "backward through the breast bone," penetrating the heart. The depth of penetration was three and one-half inches. This was a "lethal wound," the examiner said.

In addition, the examiner found three stab wounds on the "left side of the back"; two were superficial while the third entered the chest cavity. It began between ribs and went "up toward the mid line of the body and penetrated the left ventrical of the heart." This wound was also lethal, according to the examiner.

Also, the examiner found a bruise and swelling about the decedent's left hand which appeared to be "a defense wound" sustained by a person under attack who is trying to protect her face

or head from "blunt force." The examiner also found that the decedent's vagina was torn and lacerated consistent with forcible penetration of the vagina during a sexual assault.

The examiner opined that the stab wounds could have been caused by the knife found in the decedent's back. He testified that the decedent's "death was due to stab wounds of the back and chest with perforations of the right and left ventrical to the heart combined with hemorrhage and shock and the blunt force injuries that she suffered to her head and face." According to the examiner, the "most serious of her wounds" were "the stab wounds to the heart."

On January 10, the day after the attack, Lt. C. R. Thurston of the Covington Police Department interviewed defendant at police headquarters. The defendant was not under arrest and voluntarily came to the police station. The defendant told Thurston about his activities on the day in question, which mainly involved drinking whiskey with Troy Malcolm, age 19, and another friend. At that time, the defendant was living at the Malcolm home located at "128 Prospect Street." Defendant and Malcolm's 16-year-old sister, Valerie, were "girlfriend boyfriend." During the January 10 interview, defendant "basically" told Thurston that "he didn't know anything about what had happened to Ms. Balsey." Defendant was allowed to leave the police station.

On January 13, Thurston interviewed defendant in Salem at State Police Headquarters. Defendant still was not under arrest and voluntarily went with police officers to Salem for the questioning. According to Thurston, defendant changed "his story" to "some degree." He said that "on the night that the lady was killed," he saw Troy Malcolm beside the victim's home, observed him "put his shoulder" against the back door trying to gain access, and that defendant "just went and walked away." He stated that later Malcolm returned to his home with blood on his jacket. According to defendant, Malcolm stated, " 'That old bitch didn't have but $20 and I had to hit her and I stuck a knife in her.' " Defendant was not placed under arrest at that time and was released.

On January 14, Thurston and another officer observed defendant in the community walking with Valerie. When the couple saw the officers, defendant dropped a paper bag he was carrying and the couple walked rapidly away. The bag contained clothes,

according to Valerie. She and defendant left the Covington area that day and hitchhiked to Pennsylvania.

On January 15, Thurston interviewed Troy Malcolm. Immediately after taking a recorded statement from Malcolm, Thurston obtained an arrest warrant for defendant charging him with capital murder.

On January 27, Thurston and Ronald E. Cruise, a special agent of the Virginia State Police, interviewed defendant at police headquarters of Susquehanna Township, a small community adjacent to Harrisburg, Pennsylvania. Defendant had been arrested for trespassing in nearby Dolphin County, Pennsylvania, and was in custody on that charge.

During the course of the two-hour interrogation, which was recorded on audio tape, the defendant admitted to forcible entry through the locked kitchen door, to robbery of the victim of the $20 bill, and to rape. The defendant did not admit that he stabbed her. Indeed, he repeatedly denied knowing who stabbed her. There are many inconsistencies and contradictions in the statement. Essentially, defendant finally gave the following version of the events in question.

Defendant stated that during the day of the crimes he and Troy Malcolm had been consuming whiskey and beer; defendant also had been smoking marijuana and was very drunk. Defendant stated that he and Malcolm entered the house intending "to rob the woman." They did not believe anyone was in the house but when they broke through the kitchen door, "the lady was standing right there in the kitchen." According to defendant, "She hollered 'get out of my house' or something," and Malcolm struck her in the face with his fist. She fell to the floor; defendant denied striking her.

According to defendant, he then ran upstairs because Malcolm had informed him that the victim kept money there in a metal box and "he had drew me a map exactly where it was, earlier." Defendant stated that after searching the upstairs, he returned to the first floor where he saw the victim lying on the floor and Malcolm was "still hitting the woman."

Asked to explain the presence of human blood on a jacket he was wearing that night, defendant had two answers. First, he said he "grabbed her" when she "tried to get up after she was bleeding" and he "laid her back down." Second, he said that he had

been in a fight about two weeks earlier "when I got my teeth knocked out and when I got stabbed."

Upon closer questioning, defendant finally admitted, "I had intercourse with her." According to defendant, this was after Malcolm "tore her clothes off" and after a third individual named "Hillbilly" had raped her. According to defendant, the victim "was laying, like, on her back" when he raped her; he denied seeing any knife.

Defendant did not know "Hillbilly's" proper name and stated he had met him through "a drug deal." He said that "Hillbilly" had a star tattoo at the corner of his left eye and "a pot plant" tattoo on his left arm.

He said that "Hillbilly" and Malcolm ran out the back door. Defendant stated that he remained in the house "looking at that lady for a minute" because "I was scared, man, 'cause I ain't never seen nothing like that." He said that he then left the house and "ran into" two women as he was leaving.

Repeatedly during the questioning, special agent Cruise referred to statements made to the police by Malcolm such as: "I have told you that Troy Malcolm has laid the whole thing on you . . . . Troy said he was back in the pantry, cowering, because of all the things that were going on." Defendant denied the accuracy of that statement. Cruise also stated: "I got Troy Malcolm—who admits to being in the house. Yeah, we went up there. We did it. . . . 'I'm back in the pantry,' Troy says, 'and Rocky's in there doing all the bastardly deeds.' " Defendant responded, "No. That ain't the way it happened."

Near the end of the interrogation, after Cruise and Thurston had encouraged defendant to reveal who stabbed the victim, defendant said: "I didn't see that, man. You can sit there and plead with me all day, man, I did not see that. I didn't see that woman get stabbed. You can sit here and talk to me until my head turns, fall off, man, but I did not see that woman get stabbed."

David William Stull, Jr., a convict residing at the Southampton Correctional Center, testified that he "slept right beside" Rogers in a prison dormitory when they were incarcerated in " '87, maybe '88." Stull, who said he was known as "Hillbilly," exhibited to the jury a star tattoo at the corner of his eye and a tattoo of a marijuana plant on one arm, both of which Stull had worn since 1985. Stull was in prison on the day of the attack.

The Commonwealth presented extensive evidence in addition to the testimonial evidence. For example, the prosecutors offered photographs of the victim and of the exterior and interior of the home, the knife in question, and articles of clothing worn by the victim and the defendant at the time of the attack. In addition, the Commonwealth offered expert testimony describing the results of tests on blood and bodily fluids as well as the results of attempts to obtain fingerprints from many pertinent items of evidence.

Testing of the knife and candleholder revealed that no "latent prints of value for identification purposes" were "present or were developed." Tests to determine the type of human blood found on clothes worn by defendant were "inconclusive" because the garments had been washed before acquired by the police. Defendant was included as a "possible source" of semen found on the front of a sweater the victim was wearing and found on cotton removed from the victim's vagina and rectum; the cotton had been packed there after the attack and before the autopsy. Efforts to obtain a DNA profile from blood samples, vaginal swabs, and the sweater stain, and to relate the results to either the defendant or Malcolm, were unsuccessful.

The defendant presented no evidence during the guilt phase of the trial.

Only the actual perpetrator of the crime may be convicted of capital murder when, as here, the offenses constituting the charge of capital murder are the willful, deliberate, and premeditated killing of a person in the commission of robbery when armed with a deadly weapon, or while in the commission of, or subsequent to, rape. *Johnson* v. *Commonwealth*, 220 Va. 146, 149, 255 S.E.2d 525, 526-27 (1979), *cert. denied*, 454 U.S. 920 (1981); Code § 18.2-18. "Thus, neither an accessory before the fact nor a principal in the second degree may be so convicted." *Cheng*, 240 Va. at 42, 393 S.E.2d at 608.

"The Commonwealth has the burden of proving beyond a reasonable doubt that one accused of capital murder was the actual perpetrator of the crime. Suspicion of guilt, however strong, or even a probability of guilt, is insufficient to support a conviction." *Id.* And, when the evidence is wholly circumstantial, as in this case, "all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence. The chain of necessary circum-

stances must be unbroken." *Inge* v. *Commonwealth*, 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976). When, as here, motive has been proved, "the underlying evidence of motive must concur with the circumstantial evidence of other inculpatory circumstances—time, place, means, and conduct—in identifying the accused as the criminal agent beyond a reasonable doubt." *Brown* v. *Commonwealth*, 238 Va. 213, 221, 381 S.E.2d 225, 230 (1989).

. The defendant contends that the "evidence adduced at trial was insufficient, as a matter of law, to support Rogers' conviction for capital murder. Specifically, the evidence is insufficient to prove that Rogers stabbed Ms. Balsey."

The Commonwealth maintains that the evidence was sufficient to establish a jury issue on the question of criminal agency. The Commonwealth's theory at trial was that defendant "was the last man in that house," tacitly conceding that at least one other person was present at some point during this criminal enterprise. At trial, the prosecution took the position that, during a ten-minute period, defendant entered through the kitchen, never went past the dining room, picked up the $20 bill (which defendant said was on a silver tray in the dining room), raped the victim while she was on her back, stabbed her in the chest, "rolled her over" and stabbed her in the back "three times, and left [the knife] in the third time," and fled the scene, running past Bryan and Selman. At trial, the Commonwealth theorized that defendant did not go upstairs; otherwise the bedroom would have been in disarray and the $1 bills would have been taken from the downstairs hall table. The Commonwealth contended that the witnesses' statements that no person except defendant was heard or seen in the house are corroborated by facts that the front door was locked and blocked, and the upstairs windows closed, making the only available exit through the kitchen, and no one but defendant was seen to leave there.

On appeal, the Attorney General urges a slightly different theory, apparently claiming that the defendant was always alone in the house. The Attorney General on brief says that the "*only* evidence that other persons were present during the offense [was] the defendant's own statements to the police." (Emphasis in original.) The Attorney General contends that the jury had the right to disbelieve those portions of defendant's statement and to conclude that he was "the only perpetrator." Also, the Attorney General argues, "there was no opportunity for any other person to have

been present or to have committed these crimes. It was not only reasonable for the jury to infer that the defendant acted alone, it would have been unreasonable for the jury to have concluded otherwise." We do not agree.

■ Whatever theory is adopted by the Commonwealth, we hold that the evidence is insufficient, as a matter of law, to prove that defendant actually stabbed the victim, or administered any other blows which caused her death. As we have said, all necessary circumstances must be consistent with guilt, must be inconsistent with innocence, and must exclude every reasonable hypothesis of innocence. We conclude that the Commonwealth's evidence failed to establish beyond a reasonable doubt that Rogers was the so-called "triggerman" and that he wielded the knife. Stated differently, the Commonwealth has failed to exclude Troy Malcolm as the perpetrator.

The prosecution, through its own evidence, placed Malcolm in the home during the events in question. In offering the contents of the January 27 interrogation, the Commonwealth established, through Cruise's questions, that Malcolm "said he was in the pantry, cowering, because of all the things that were going on." Additionally, Cruise stated that, "I got Troy Malcolm — who admits to being in the house." According to Cruise, Malcolm said, "Yeah, we went up there. We did it."

■ The significant weakness in the Commonwealth's case is the lack of any evidence, direct or circumstantial, which places the murder weapon in defendant's hands. The evidence of defendant's conduct has not concurred with motive, time, place, and means in identifying the accused as the criminal agent beyond a reasonable doubt. Even if we completely discard defendant's repeated statements that he did not stab the victim, importantly there is no evidence that his fingerprints were on the knife. Indeed, there is no evidence which, by legitimate inference or otherwise, places the knife in his possession at any time.

■ The evidence creates at least one reasonable hypothesis of defendant's innocence. Reasonably to be concluded from the evidence is that Malcolm was present in the home, as leader of the scheme to rob the victim. Malcolm stabbed her after defendant had raped her. Bryan's loud "pounding" on the front door and the subsequent ringing of the telephone alerted Malcolm, who fled the premises through the back door an instant before Bryan and Selman approached the rear of the house. At this moment, the drunk

and scared defendant was standing in the dining room "looking at that lady for a minute" because he "ain't never seen nothing like that." He then attempted to leave through the kitchen as the witnesses arrived.

Another scenario would have Malcolm conceal himself in the pantry, having already stabbed the victim, as the witnesses entered the kitchen. During the seconds while the witnesses were in the dining room before Selman returned momentarily to the kitchen, Malcolm ran from the pantry through the kitchen and was heard by Selman, when she returned to the kitchen, running toward the alley.

The Commonwealth argued at trial that the only inference to be drawn from the evidence is that Rogers stabbed the victim. This argument was based on the assertion that Rogers was the last person who left the home, that he admitted raping the victim while she was on her back, and that he could not have so raped her while she had a knife in her back. The argument does not persuade us for two reasons. First, that argument assumes that, in the sequence of events, the rape by defendant was the last crime committed before defendant left. Under the evidence, the rape of the victim, as we have indicated, could have occurred in point of time prior to the stabbings. Second, even if the rape by defendant occurred last, it could have been accomplished even though the knife was in the victim's back. We have closely examined the knife in the record; in view of the amount of bend to the blade and the angle of entry, the victim could have been lying on her back, or partly so, with it sticking in her back. After the rape, she could have turned over to the position in which she was found by the witnesses.

In summary, the evidence viewed in the light most favorable to the Commonwealth creates a strong suspicion, indeed a probability, that defendant was the criminal agent in the victim's death. But, as we have said, suspicious circumstances and probability of guilt, no matter how strong, are insufficient to sustain a criminal conviction. Because the circumstances of defendant's conduct do not exclude the reasonable hypothesis that Troy Malcolm killed the victim, the capital murder prosecution fails. *See Cheng*, 240 Va. at 43, 393 S.E.2d at 608; *Stover v. Commonwealth*, 222 Va. 618, 624, 283 S.E.2d 194, 197 (1981).

Accordingly, we will reverse the judgment of conviction in the capital murder case and remand it for a new trial for an offense

no greater than murder in the first degree. Because of the remand, we have considered those assignments of error which raise issues that may arise upon retrial. We have concluded that the trial court correctly ruled on each of those questions; thus, there is no merit in those assignments of error.

Record No. 910479 - *Reversed and remanded.*
Record No. 910480 - *Affirmed.*