# COURT OF APPEALS OF VIRGINIA

## Record No. 1796-24-2

TIFFANEY N. BRATTON

v.

COMMONWEALTH OF VIRGINIA

Present: Chief Judge Decker, Judges Malveaux and Duffan
Argued at Richmond, Virginia

Opinion Issued April 28, 2026[*]

## FROM THE CIRCUIT COURT OF HALIFAX COUNTY
Donald C. Blessing, Judge

James E. Midkiff (James E. Midkiff, P.C., on brief), for appellant.

Allison M. Mentch, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE MARY BENNETT MALVEAUX

Following a jury trial, the trial court convicted Tiffaney N. Bratton of embezzlement of public funds, in violation of Code § 18.2-112, and misdemeanor embezzlement, in violation of Code § 18.2-111. On appeal, Bratton argues that the trial court erred by denying her motion to strike and post-trial motion to set aside the verdict because the evidence was insufficient to sustain her convictions, and because the jury returned verdicts that were "inconsistent with the evidence." She also contends that her right to a fair trial was denied because of juror misconduct. For the following reasons, we affirm her convictions.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND

"On appeal, 'we review the evidence in the "light most favorable" to the Commonwealth,' the prevailing party below." *Diaz v. Commonwealth*, 80 Va. App. 286, 295 (2024) (quoting *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc)).

<u>The Offense</u>

This matter involves missing currency that had been stored in the South Boston Police Department's evidence room. The evidence room is located in the basement of the police department and consists of a main room and three separate smaller rooms: rooms one, two, and three. A logbook is kept in the main room where, according to department policy, every time an officer enters or exits the room, they fill in their name, the date, and the time. A safe containing currency is located in room three. A key is required to open the door to the evidence room, and the door locks automatically when it closes. In March 2021, surveillance cameras that retain video recordings for 60 days were installed throughout the evidence room, including in room three.

Temporary storage lockers are located just outside of the evidence room. These lockers are used by officers to store evidence if an evidence custodian is not available to log in the piece of evidence. An officer places the evidence into a drawer at the top of the temporary storage locker, and the drawer then closes. A combination is required to open and remove evidence from the temporary storage locker.

To log evidence in and out of the evidence room, officers use a computer system called ShieldWare. If evidence is removed from the room, that removal has to be noted on this system.

Bratton, an officer at the police department, was promoted to lieutenant in April 2021. In this role, Bratton was responsible for the care, custody, and control of the property kept in the evidence room. She was given training on the department's property and evidence procedures,

and also a manual outlining these procedures. As part of her training, Bratton was instructed that whenever evidence was removed from the evidence room, she was required to update its location in ShieldWare. Additionally, as part of her job, Bratton handled asset forfeiture matters, where police officers would seize money related to a crime and store it in the evidence room. She was responsible for completing paperwork for asset forfeitures and depositing forfeiture money into the police department's bank account.

Sergeant Chris Carswell was also involved in maintaining the police department's evidence, serving as the department's property and evidence technician. In that role, he acted as records custodian for property and evidence contained in the evidence room and was responsible for the evidence's safekeeping.

In July 2021, Carswell, along with Officer Ed Cawthorne, began an audit of the money in the currency safe in room three. While the policy of the police department was to perform a quarterly audit of the evidence contained in the evidence room, those audits had not routinely occurred prior to 2021. Money seized or found by police often had been placed in the safe in specific currency bags. On July 22, 2021, Carswell made a list of currency bags contained in a larger bag in the safe that held all of the currency bags from 2018. In doing so, he found a bag marked as relating to the "Willie Brandon" case.

On August 6, 2021, Carswell returned to his review of the 2018 currency bags and found that the Willie Brandon currency bag was missing from the safe. In trying to locate the currency bag, Carswell reviewed surveillance footage from July 22. He saw that he had placed the bag back into the safe and also that Bratton entered the evidence room on that date.

The surveillance footage from July 22, admitted at trial, shows that at 8:20 p.m., Bratton used her key to enter the evidence room. Bratton then went to the table where the logbook was located, picked up a pen, and moved her hand across the logbook, appearing to sign in. She then

entered room three and opened the safe, and, a few minutes later, took a bag out of the safe and placed it on the ground. With her back turned to the camera, Bratton stood up with the bag in her hands and then moved her hands to her midsection. When Bratton turned and faced the camera, the bag was no longer in sight. Bratton exited room three, walked back to the logbook, and again moved her hand across the book. The logbook, admitted into evidence, showed that Bratton did not sign in or out of the evidence room on July 22.

After viewing the footage, Carswell reported Bratton's activity to the police chief. On August 11, 2021, Carswell returned to the safe to again review the 2018 currency bags with Cawthorne. During his inventory, Carswell discovered additional missing currency bags: one each from the "Quentin Tucker," "Lawrence Jennings," and "Michael Williams and Stephanie Hudson" cases; two from the "Marcus Stovall" case; and one from an unnamed case. None of these bags had been marked as removed from the evidence room on the ShieldWare system.

Dennis Barker, the assistant town manager for South Boston, reviewed the evidence room's surveillance footage from the summer of 2021. During that period, there were four occasions, including on July 22, where Bratton entered the evidence room but did not sign in on the logbook. The surveillance footage from those days was admitted at trial and played for the jury.

On July 6 at 8:24 p.m., Bratton, while holding a large piece of paper in one hand, unlocked the door to the evidence room and then entered it. She walked over to the table with the logbook, picked up a pen, and moved her hand across the logbook. She then entered room three, opened the safe, and removed two large bags. After kneeling on the floor with the bags in front of her for several minutes, Bratton placed both large bags back into the safe and stood up with a small bag in her hand. She placed a large piece of paper on top of the small bag and left

room three. Bratton walked to the table with the logbook, moved her hand across the logbook, and exited the room.

On July 15, Bratton used her key to enter the evidence room at 7:15 a.m. While holding a folder in her hand, Bratton walked over to the logbook and, while holding a pen, moved her hand across the logbook. She then entered room three, opened the safe, and removed and looked at several bags from the safe. After she returned the larger bags to the safe, Bratton then stood up while holding one small bag in her hand. She then left room three with only the large folder visible in her hand. Bratton returned to the logbook, picked up a pen, placed it back down, and exited the room.

On July 31, at 11:01 p.m., Bratton used her key to unlock the evidence room and then entered the room. She walked to the logbook and picked up a pen and moved her hand across the logbook. Bratton then went into room three and opened the safe. She took a few large bags out of the safe and looked inside each one. While doing so, she removed several smaller bags from the larger bags. With her back turned to the camera, Bratton placed the larger bags back into the safe. Bratton left the room and returned to the logbook, picked up a pen, and moved her hand across the logbook.

During the month of July 2021, Carswell and Bratton were the only officers with the combination to unlock the safe. During that same time period, three people had keys to the property and evidence room: Carswell, Bratton, and Investigator Cameron Collie. Another officer, Kent Bane, received a key to the room in early August 2021 when Bratton gave him her key.

On three separate dates in May and June of 2021 Bratton had a negative balance in her bank account. Later that summer, Bratton made several cash deposits into her bank account: $700 on July 7, 2021; $1,800 on July 23, 2021; and $1,000 on August 10, 2021.

Proceedings at Trial

During voir dire, each member of the venire affirmed that they would be impartial and had no bias or prejudice toward Bratton. They each also affirmed that they had not formed an opinion as to Bratton's guilt or innocence. When asked if anyone knew Bratton, Juror R.S. did not respond affirmatively.

At trial, Carswell, Bane, and Collie, the officers with keys to the evidence room in July and August 2021, all denied taking any money from the safe. Officers also testified about the contents of the currency bags and when they had been placed into the safe. According to the property report for the Willie Brandon case, on November 9, 2018, Investigator Tracy Mocarsky deposited a currency bag containing $1,613 in cash into the temporary storage locker; on November 13, 2018, Carswell transferred the bag to the safe. Mocarsky and Carswell both testified that the property report was accurate. According to a property report for the Quentin Tucker case, on December 28, 2018, Mocarsky deposited a currency bag containing $1,739 into the temporary storage locker, and on January 2, 2019, Sergeant Amy Jackson transferred the bag to the safe. Mocarsky and Jackson both testified that the property report was accurate. According to a property report for the Lawrence Jennings case, on June 8, 2016, Lieutenant Tom Lewis deposited a currency bag containing $511 into the temporary storage locker, and that same day Carswell transferred the bag to the safe. Lewis and Carswell both testified that the property report was accurate. According to a property report for the Marcus Stovall case, Randy Redd, an officer at that time, deposited two currency bags containing $3,020 and $4,000 directly into the safe on December 23, 2017. Redd testified that the property report was accurate. According to a property report for the Michael Williams and Stephanie Hudson case, on February 25, 2020, Lieutenant Clinton Mann deposited a currency bag containing $2,920 into the temporary storage locker, and on February 27, 2020, Carswell transferred the bag to the safe. Mann and Carswell

testified that the property report was accurate. According to a property report for the unnamed currency bag, on December 19, 2013, Timothy Vanarnem, an officer at that time, placed a currency bag containing $885 into a temporary storage locker, and on December 20, 2013, Carswell transferred the evidence bag into the safe. The property report also indicated that Carswell removed the evidence from the safe on January 22, 2015, and placed it back into the safe that same day. Vanarnem testified that he did not specifically remember counting the money prior to placing it into the storage locker, but that it was his usual practice to count it. Carswell testified that the property report was accurate. Carswell further testified that he removed the evidence on January 22 to take it to court and returned it after the court proceedings were finished.

On cross-examination, Carswell acknowledged that the police department's policies and procedures related to the evidence room were not strictly followed. Carswell admitted there had been multiple occasions during the summer of 2021 when he would close but did not always lock the safe at the end of the day because the combination was "a bit tricky." Carswell left the safe unlocked on July 22, the day the Willie Brandon bag went missing. He also admitted to testifying at the preliminary hearing that he recalled leaving it unlocked only one time, but later noticed, after reviewing the surveillance footage, that he had left it unlocked several times. Carswell acknowledged leaving some money in a black plastic tub in the main room of the evidence room, rather than in the safe, contrary to the police department's policies and procedures. Carswell also testified at the preliminary hearing that he placed the currency bags back in the safe right after making a list of bags on June 22, 2021; but at trial, the surveillance footage showed that he did not do so. He testified at trial that he did not recall exactly when he placed the bags back in the safe, but did so sometime that day and did close the door to the evidence room upon leaving. Carswell admitted that there were other occasions where money

was left unsecured on a table in the main room of the evidence room. Carswell also admitted that in March 2021 he took money from the evidence room and kept it in his patrol car overnight, in violation of the police department's policies and procedures. Carswell explained that, because he was going to be in Lynchburg the next day for training, his supervisor told him to take the money and deposit it at a bank in Lynchburg that following day. Carswell testified that he deposited the money, and the Commonwealth introduced a receipt which showed that $1,204 had been deposited.

On cross-examination, Barker testified that he was in charge of the evidence room from October 2018 to January 2021 and that he did not conduct an audit of the room during this period of time. Barker acknowledged that in July 2022, Bane, on two occasions, and Collie, on one occasion, were in the evidence room but failed to sign in on the logbook. Barker also admitted at trial that he and Carswell had worked together for many years at the police department and were friends. He acknowledged that he did not criticize Carswell in his internal affairs report. On redirect, Barker testified that every time Carswell was shown in the video footage accessing the safe, there was a corresponding entry in the logbook. He further stated that when he reviewed the surveillance footage, he never saw Carswell hide money in his shirt.

After the Commonwealth rested, Bratton moved to strike the evidence. The trial court denied the motion. After presenting evidence, Bratton renewed her motion to strike. The court again denied the motion. The jury found Bratton guilty of embezzlement of public funds and misdemeanor embezzlement.

Post-Trial

Following the jury trial, Bratton filed a motion to set aside the verdict. In her motion, she argued that the jury's verdict was contrary to the evidence. Bratton further argued that the verdict should be set aside due to juror misconduct.

In support of her juror misconduct argument, Bratton attached an affidavit of an investigator who had interviewed Juror R.S. after the trial concluded. This juror "indicated that prior to the trial, he had both general and specific knowledge about Lt. Bratton, some of which negatively influenced his view of her." The juror reported that he knew Bratton's sister and visited the family home on several occasions, including when Bratton was living at the home. He also stated that "he was aware that Lt. Bratton had gotten in trouble before for tasing someone and had to go to court about it" and responded affirmatively when asked if this incident "reflected poorly on her character." In addition, when asked about jury deliberations, "Juror R.S. indicated that prior to the conclusion of trial, jurors had discussed the case 'during breaks and stuff.'" Bratton contended that Juror R.S.'s prior knowledge "formed a bias in the mind of the juror which prejudiced [her] right to a fair trial and due process of the law." She also asserted that the jurors' discussion prior to formal deliberation had been prejudicial to her.

The trial court held a hearing on the motion. During the hearing, Juror R.S. testified that he "knew of" Bratton prior to the trial. Juror R.S. stated that, during the 1990s, he had been friends with Bratton's sister. During that time, he visited the sister's house where Bratton was living but never spoke directly to Bratton. He stated that when asked during voir dire whether he "kn[e]w" Bratton, he interpreted this question as asking if anyone knew her on "a personal level," which he said he did not.

Juror R.S. also acknowledged that he knew that Bratton had been involved in an incident where a taser was used on an individual during her employment as a police officer. He testified that the taser incident left him with the impression that Bratton had made mistakes in her police work. He further stated that his knowledge of the tasing incident did not have "any influence on [his] verdict in this case involving taking money"; instead, he testified that his verdict was based

on "[t]he camera footage."  He did not tell the other jury members about the tasing incident, and it was not mentioned in their deliberations.

Juror R.S. also stated that the jurors talked about the evidence throughout the several days of the trial prior to their deliberation.  These discussions happened in the juror room during breaks.  The jurors did not comment on the witnesses' credibility, but did discuss "what the evidence was; in this particular case, camera[s]" and that "[c]ameras don't lie."

After hearing Juror R.S.'s testimony, the trial court stated that it did not "think [Juror R.S.] was answering dishonestly" because "his knowledge backed up that he really did[ not] know [Bratton]" and "[h]e did not know her because he did not have a relationship with her."  It also found that Juror R.S. did not "inject[] . . . any information . . . about her that could have caused a negative opinion by the jury.  He said any adverse opinion he had of her didn't come into play."  The trial court instead found that Juror R.S. did not base his verdict on his prior knowledge of Bratton but rather "looked at the video and the proof of value as the jury did."  The court further found that Juror R.S. was a "very credible, believable witness."  Accordingly, the court denied the motion to set aside the verdict.

This appeal followed.

ANALYSIS

A.  Sufficiency of the Evidence

Bratton argues that the trial court erred in finding the evidence sufficient to sustain her convictions.

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one."  *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024).  "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'"  *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)

- 10 -

(quoting Code § 8.01-680).  The question on appeal is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Cappe v. Commonwealth*, 79 Va. App. 387, 398 (2024) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)).  "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'"  *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

"[W]hen the evidence is wholly circumstantial[,] . . . all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence."  *Haas v. Commonwealth*, 299 Va. 465, 468 (2021) (third alteration in original) (quoting *Rogers v. Commonwealth*, 242 Va. 307, 317 (1991)).  "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt."  *Vasquez*, 291 Va. at 249-50 (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).  "[T]he question" on appellate review "is not whether there was 'some evidence' to support a defendant's hypothesis of innocence, because the totality of the circumstantial evidence may allow a factfinder to reject an asserted hypothesis of innocence as unreasonable."  *Commonwealth v. Wilkerson*, 304 Va. 92, 102 (2025) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017)).  "[W]hether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on [this Court] unless plainly wrong."  *Clark v. Commonwealth*, 78 Va. App. 726, 752 (2023) (alterations in original) (quoting *Maust v. Commonwealth*, 77 Va. App. 687, 700 (2023) (en banc)).

Bratton contends that the police department's policies and procedures regarding the evidence room were regularly disregarded by officers during the time period that the offenses

allegedly occurred. Thus, she argues, the evidence was insufficient to establish that she was the individual who took the missing money from the safe.

Bratton relies on *Webb v. Commonwealth*, 204 Va. 24 (1963), in support of her argument. In *Webb*, our Supreme Court held that a bookkeeper could not be held criminally liable for embezzling funds "merely because the funds received had not been deposited where there is an obvious lack of internal control and where persons other than the accused received funds and made some entries in the accounts in the absence of a showing that he converted the funds to his own use." *Id.* at 34. In that case, a review by an accountant showed a years-long shortage in deposits from money contained in a cash drawer used by the bookkeeper, the defendant. *Id.* at 27-29. The defendant had been asked about two missing deposit slips, which she later turned over to a consultant of the business and were found to be inaccurate. *Id.* at 28-29. In reversing the defendant's conviction, our Supreme Court noted that "[t]he only evidence of a shortage was based on the fact that the deposits and cash on hand over the period in question did not equal the cash receipts as shown on the books." *Id.* at 34. The Court further noted that

> [t]here was a glaring weakness in the system of the internal control. All of the employees of the office received payments on accounts, made change from the cash drawer, borrowed money from it, and cashed their own checks and those of customers out of the cash drawer. Four persons connected with the firm knew the combination of the safe. Some entries were made in the books by persons other than the defendant. Incidental expenses of the firm were paid out of the daily receipts from the cash drawer, and under the system set up by [the employer's business consultant] no records, which could be audited, were kept of those expenses. Hence under this system all receipts were not deposited in the bank. This could account for the difference between receipts and deposits and the amount of cash on hand. It is impossible to establish a shortage of funds for which the defendant would be responsible without a detailed audit of the firm's books showing all receipts and disbursements.

*Id.* at 35.

Bratton asserts that "[t]he unifying theme of the deficits the Court identified in *Webb* were that multiple people had access and opportunity to have taken the missing money, rules that limited the risk of abuse may have existed, but were not enforced, and the records maintained as a result were not reliable." Thus, she argues, like in *Webb*, the lack of internal controls here compels the conclusion that the evidence is insufficient to support her convictions. We disagree, finding *Webb* distinguishable from the facts in the case at hand.

Here, the evidence established that only two individuals had the combination to unlock the safe—Carswell and Bratton. And while Bratton is correct in noting that the safe was left unlocked on several occasions during July 2021, she ignores the fact that during the relevant time period, from July 2021 through August 2021, only three people had keys to the property and evidence room—Bratton herself, Carswell, and Collie. Carswell and Collie denied taking any of the missing currency bags at trial.

Moreover, and highly probative in this case, the surveillance footage shows that on July 22, 2021, Bratton used her key to enter the evidence room, opened the safe and took a currency bag out of it. With her back turned to the camera, she stood up with the bag in her hands and then made gestures with her arms around her midsection. When Bratton turned and faced the camera, the bag was no longer in sight. Bratton made motions indicating that she was signing in and out on the logbook but did not actually sign in or out of the evidence room that day. Bratton was also seen entering the evidence room and opening the safe without signing in or out on the logbook on three other instances in July 2021. On two of those occasions, she can be seen taking a bag out of the safe and then leaving the room with a large object covering her hand from view.

In addition, Bratton's bank account had a negative balance on three separate dates in May and June of 2021, and she later made cash deposits into her bank account in July and August of 2021 in the amounts of $700, $1,800, and $1,000.

The record demonstrates that officers, including Carswell, did not adhere to the police department's policies and procedures regarding the evidence room and the safekeeping of evidence. But it also showed that on several occasions Bratton entered the evidence room using her key, opened the safe, and removed currency bags from the safe while pretending to sign the logbook and making efforts to conceal items in her hands from view. This conduct occurred during a time when Bratton deposited large sums of cash into her bank account that recently had a negative balance, supporting an inference that Bratton converted the missing funds to her own use.[2] From this evidence, the jury could reasonably determine that Bratton was the individual responsible for taking the missing currency from the police department's safe.[3]

---

[2] We further note that Bratton's specific argument about a lack of internal controls meaning that evidence is insufficient to prove embezzlement has been rejected by this Court in an unpublished decision, *Briggs v. Commonwealth*, No. 0730-13-2 (Va. Ct. App. Apr. 8, 2014). That case also discussed *Tribuzi v. Commonwealth*, 25 Va. App. 289, 290-91 (1997), where this Court found insufficient evidence of embezzlement where a hospital worker shared with several others the duty to manage the revenues of the hospital cafeteria, and an accounting showed that some of these revenues were inexplicably missing. This Court held that *Webb* and *Tribuzi* "do not represent, as [the defendant] suggests, rules of law requiring proof of 'exclusive access' or reliable 'internal controls' as preconditions to convicting a defendant of embezzlement, as if they served as *de facto* elements of the offense." *Briggs*, slip op. at 7.

[3] Bratton also argues that the trial court erred in denying her motion to set aside the verdict because the verdicts were inconsistent with the evidence. "A trial court's judgment approving a jury's verdict is entitled to great weight on appeal and will not be disturbed unless it is contrary to law or plainly wrong." *Wagoner v. Commonwealth*, 63 Va. App. 229, 244 (2014) (quoting *Gray v. Commonwealth*, 233 Va. 313, 344 (1987)); *see also* Code § 8.01-680. Bratton notes that she was charged with felony embezzlement, but the jury convicted her of misdemeanor embezzlement, the only difference between the two charges being proof that the value of the embezzled funds was over $1,000. She argues that if the jury had accepted Carswell as a credible witness, there would be no basis for concluding that she committed anything other than felony embezzlement because his testimony was that the Willie Brandon bag contained $1,613. Thus, she contends, the jury's misdemeanor conviction indicates that it determined that Carswell was an unreliable witness and rejected his testimony regarding the Willie Brandon bag. She further asserts that "[a]s the Willie Brandon bag is by far the best attested of the missing money, there is no alternate basis for concluding that *any* of the missing money can be attributed to" her, and therefore "[o]ne way or the other, the jury's verdict was contrary to the evidence" and this Court should order a new trial. We find no merit in this argument as it contains nothing more than mere conjecture as to the jury's reasoning in making its determination. "[W]here credible evidence in the record supports the jury's verdict, we will not speculate on the jury's

B.  Juror Misconduct

Bratton argues that the trial court erred in denying her motion to set aside the verdict due to juror misconduct.[4]  She contends that the trial court should have granted her a new trial based on Juror R.S.'s dishonesty during voir dire and his prior knowledge of an incident where Bratton used a taser during her police work, and because of the jury's premature deliberations.

"The right to be tried by an impartial jury is guaranteed under both the United States and Virginia Constitutions."  *Taylor v. Commonwealth*, 61 Va. App. 13, 22 (2012).  "Pursuant to these constitutional protections, it is the [trial] court's duty to empanel jurors who are free from bias and prejudice against the defendant."  *Fields v. Commonwealth*, 73 Va. App. 652, 666 (2021).  "Virginia recognizes implied bias claims based on juror dishonesty during voir dire and actual bias claims based on 'additional circumstances occurring outside the voir dire.'"  *Clark*, 78 Va. App. at 770 (quoting *Blevins v. Commonwealth*, 267 Va. 291, 298 (2004)).  "[A] two-part test [is] applied in determining whether a litigant is entitled to a new trial in cases alleging juror dishonesty during *voir dire*."  *Blevins*, 267 Va. at 296.  "[I]n order to obtain a new trial in such situations, a litigant 'must first demonstrate that a juror failed to answer honestly a material

---

reasoning, nor will we subvert that reasoning absent a clear showing of error."  *Harris v. Commonwealth*, 19 Va. App. 518, 522 (1995).  Moreover, to the extent her argument is a challenge to the credibility of Carswell's testimony, we emphasize that a trier of fact is "free to believe or disbelieve, in part or in whole, the testimony of any witness."  *Bazemore v. Commonwealth*, 42 Va. App. 203, 213 (2004) (en banc).  The jury could have discounted Carswell's testimony about the amount of cash contained in the missing currency bag while still finding that Bratton took the bag.  Or the jury could have concluded that Bratton took one of the missing currency bags with a lower amount of cash inside, either the bag containing $511 in cash or the bag containing $885 in cash.

[4] The Commonwealth argues that this assignment of error has been procedurally waived because it fails to identify a specific ruling of the trial court.  Rule 5A:20(c)(2) provides that "[a]n assignment of error that does not address the findings, rulings, or failures to rule on issues in the trial court . . . is not sufficient."  Bratton's second assignment of error is that her "right to a fair trial was denied because of juror misconduct."  We conclude that the assignment of error, while not artfully drafted, addresses a ruling of the trial court—the court's denial of the motion to set aside the verdict due to the juror misconduct issue.

question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.'" *Id.* at 296-97 (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.* at 297.

Here, we conclude that Bratton failed to demonstrate that Juror R.S. provided a dishonest answer to a material question during voir dire. The trial court found that Juror R.S. did not dishonestly answer the question of whether he knew Bratton because "his knowledge backed up that he really didn't know her" and "[h]e did not know her because he did not have a relationship with her." This finding is supported by the evidence. Juror R.S. testified at the hearing that he only "knew of" Bratton prior to the trial but did not know her on "a personal level." *See Allied Concrete Co. v. Lester*, 285 Va. 295, 309-10 (2013) (holding that the trial court did not err in denying a motion for a mistrial due to juror dishonesty when the record demonstrated that "while [the juror] may have known of [one of the attorneys], there is no evidence that she actually knew [that attorney]").

Bratton also failed to demonstrate that a correct response would have provided the trial court with a valid basis for a challenge for cause. The trial court found that Juror R.S. did not base his verdict on his prior knowledge of Bratton but rather "looked at the video and the proof of value as the jury did." This finding is also supported by the record. Juror R.S. testified that his verdict was based on "[t]he camera footage," not his prior knowledge of Bratton. And his testimony did not indicate any bias against Bratton due to his prior relationship with Bratton's sister. Accordingly, Bratton has not established any implied bias against her based on R.S.'s response to questioning on voir dire.

- 16 -

We also reject Bratton's general Sixth Amendment claim of juror bias based on Juror R.S.'s prior knowledge that Bratton had used a taser on someone while she served as a police officer. "To succeed on such a claim, a party must demonstrate at a hearing that the juror had 'actual bias' against him." *Clark*, 78 Va. App. at 770 (quoting *Blevins*, 267 Va. at 298). Juror R.S. testified that the taser incident left him with the impression that Bratton had made mistakes in her police work. But when asked specifically whether the tasing incident had "any influence on [his] verdict," Juror R.S. responded no because his verdict was based on "[t]he camera footage." Based on these circumstances, we conclude that Bratton failed to establish that Juror R.S. harbored an actual bias against her.

Bratton further argues that the jury's deliberation prior to the case being submitted was prejudicial to her. "[A] motion for a new trial on the ground of juror misconduct is addressed to the sound discretion of the trial judge." *Bethea v. Commonwealth*, 68 Va. App. 487, 506 (2018) (alteration in original) (quoting *Evans v. Commonwealth*, 39 Va. App. 299, 237-38 (2002)). "A reviewing court can conclude that 'an abuse of discretion has occurred' only in cases in which 'reasonable jurists could not differ' about the correct result." *Id.* at 506-07 (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)). "When possible juror misconduct is the issue on appeal, the appellant carries the burden of establishing 'a *probability of prejudice* to the accused.'" *Id.* at 507 (quoting *Jackson v. Commonwealth*, 267 Va. 178, 199 (2004)). In addition, "neither the sole fact of irregularity nor the mere suspicion of injustice based upon the irregularity is sufficient to warrant setting aside a verdict." *Caterpillar Tractor Co. v. Hulvey*, 233 Va. 77, 82 (1987). Virginia appellate courts "have . . . generally 'limited findings of prejudicial juror misconduct to activities of jurors that occur outside the jury room,'" *Jackson*, 267 Va. at 199 (quoting *Jenkins v. Commonwealth*, 244 Va. 445, 460 (1992)), and events "that

interjected information about the case that was not admitted into evidence," *Riner v. Commonwealth*, 268 Va. 296, 318 (2004).

Contrary to Bratton's assertion, the record here demonstrates that the jury's premature deliberations did not prejudice her. While Juror R.S. testified that the jurors talked about the evidence throughout the several days of the trial, he said that he did not mention the tasing incident and that it was not discussed by the jurors. He further explained that these discussions happened in the jury room during breaks, not outside the courthouse. And the jurors did not comment on the witnesses' credibility, but did discuss "what the evidence was; in this particular case, camera[s]" and that "[c]ameras don't lie." The trial court found Juror R.S. "very credible." Based on these circumstances, we conclude that the trial court did not err in denying the motion to set aside the jury verdict based on the premature jury discussions because Bratton did not establish a probability of prejudice resulting from any juror misconduct. *See Bethea*, 68 Va. App. at 507 (quoting *Jackson*, 267 Va. at 199).

## CONCLUSION

We hold that the evidence was sufficient to support Bratton's convictions. We also hold that Bratton failed to establish that the trial court erred in denying her motion to set aside the verdict. Accordingly, we affirm the trial court's judgment, but we remand the matter for correction of a scrivener's error in the sentencing order.[5]

*Affirmed and remanded.*

---

[5] We affirm the convictions but remand the case for the limited purpose of correcting a clerical error in the final order. *See* Code § 8.01-428(B). The trial court orally denied Bratton's motion to set aside the verdict at the August 20, 2024 sentencing hearing; however, the sentencing order in this case omits the court's ruling on that motion. We find that this omission was a scrivener's error and remand the case to the trial court to correct the scrivener's error. Code § 8.01-428(B).